# EXHIBIT A

This document was not written with publication in mind
and is not binding precedent of the board.

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

---

Ex parte GLOBAL PATENT HOLDINGS, LLC[1]

---

Appeal No. 2006-0698
Reexamination Control No. 90/005,742[2]
Patent No. 5,235,341[3]

> MAILED
>
> DEC 2 6 2006
>
> U.S. PATENT AND TRADEMARK OFFICE
> BOARD OF PATENT APPEALS
> AND INTERFERENCES

HEARD: April 5, 2006

---

Before MARTIN, LEE, and MOORE, Administrative Patent Judges.

MARTIN, Administrative Patent Judge.

### DECISION ON APPEAL

---

[1] The current owner of the patent under reexamination. Supplemental Appeal Brief at 1. PTO assignment records reveal that previous owners include IP Innovation, L.L.C., and TechSearch, L.L.C.

[2] This reexamination proceeding is the result of a request filed on June 9, 2000, by an anonymous requester, c/o Blakely, Sokoloff, Taylor & Zafman LLP.
A November 13, 2000, "Decision Dismissing Petition and Returning Improper Papers" (Paper No. 8) held (1) that a third-party request for reexamination filed on July 3, 2000, by Gabriel Katona will be treated as a prior art citation under 37 CFR § 1.510 and (2) dismissed a duplicate request for reexamination filed by Gabriel Katona on August 29, 2000.

[3] Issued October 12, 1993, based on Application 07/683,972, filed April 11, 1991, naming as inventors: Anthony I. Rozmanith and Neil Berinson. The '341 patent identifies itself as a continuation-in-part of Application 07/665,528, filed March 4, 1991. Appellant does not contend that any of the rejected claims are entitled to benefit of the filing date of the '528 application.

Reexamination Control No. 90/005,742
Patent 5,253,341

1       This is an appeal under 35 U.S.C. §§ 134 and 305 from the examiner's final rejection of

2   claims 9-11, 14, and 93-104, which are all of the claims under reexamination, under 35 U.S.C.

3   §§ 102, 103, and/or 112.  We affirm-in-part.  More particularly, we affirm rejections of all of the

4   claims except claim 101.

5   **A.  Related litigation**

6       The brief states that "[t]he '341 patent is involved in a lawsuit filed in the United States

7   District Court for the Northern District of Illinois on July 9, 1999, Case No. 99 C 4550."  Brief

8   at 1.

9   **B.  Summary of this reexamination proceeding to date**

10      The '341 patent issued with claims 1-16, of which claims 1-3 and 7 are independent

11  claims.  The order granting reexamination indicated that all of the patent claims are subject to

12  reexamination.[4]

13      The first Office action[5] ("First Action"), mailed February 23, 2001, included a number of

14  grounds of rejection, including a § 102(e) rejection of claims 1-8 and 15 for anticipation by

15  Filepp and a § 103(a) rejection of claims 9-14 and 16 for obviousness over Filepp in view of

16  "well known practices," namely, the allegedly well-known use of UNIX-based host systems and

17  server systems, RISC and CISC microprocessors, a windowing environment, and multiple

18  compression techniques.  First Action at 11-12.

---

[4]  Order Granting/Denying Request for Reexamination (Paper No. 5).

[5]  Paper No. 9.

Reexamination Control No. 90/005,742
Patent 5,253,341

1    Appellant responded with an amendment which (a) canceled claims 1-8, 12, 13, 15, and

2    16; (b) rewrote dependent claims 9-11 and 14 in independent form while also amending

3    "compressed or non-compressed" to read "compressed"; (c) added new claims 17-92, and

4    (d) requested that the examiner's assertions of "well known practices" be supported by the

5    citation of references.[6] Following an interview with the examiner,[7] appellant filed a supplemental

6    response[8] which canceled claims 17-92, added new claims 93-104, and was accompanied by a

7    Rule 132 declaration by Anthony Brown alleging commercial success of the claimed invention.

8    In a nonfinal second Office action ("Second Action"")[9] by a different examiner,[10] the

9    examiner held the Brown Declaration ineffective to prove commercial success.  Second Action

10   at 1,   para. 4.  As support for the assertion that "well known practices" included UNIX-based

11   host systems and server systems and RISC and CISC microprocessors, the examiner cited The

12   Electronics Engineers' Handbook and twenty-nine articles apparently obtained from the on-line

13   Gale Group Computer Database, File 275, which we will hereinafter refer to as "the Gale

14   articles."  Second Action at 7-8, para. 11.  These articles apparently were selected using the

15   search terms "network," "Unix," "server," "RISC," and "CISC," as evidenced by the fact that

16   these terms appear in bold in the articles.  Regarding the use of a windowing environment,

---

[6]  "Response to February 23, 2001, Office Action in Reexamination " (Paper No. 12).

[7]  The Interview Summary Record is Paper No. 15.

[8]  "Supplemental Response to February 23, 2001 Office Action and May 22, 2[0]01 Interview in Reexamination" (Paper No. 16).

[9]  Paper No. 20.

[10]  The reexamination proceeding was assigned to a different examiner at appellant's request.  June 27, 2001, "Decision on Petition" (Paper No. 18).

Reexamination Control No. 90/005,742
Patent 5,253,341

1   recited in claim 14, the examiner asserted, without citing a reference, that it was known to use a

2   program called Xwindows. Id. at 6.

3       As evidence that it was known to use more than one compression technique, the examiner

4   cited an article by Carr and U.S. patents to De Maine, Giltner, Notenboom, and LeGall. Second

5   Action at 8. In addition to repeating the rejection based on Filepp in view of "well known

6   practices," the examiner added new rejections based on U.S. patents to Yurt,[11] Kirchner, Cohen,

7   and Sugiyama and on articles by Punj and Bridges and also rejected some claims under the first

8   and/or second paragraphs of § 112.

9       Appellant responded[12] by amending claims 93-96 and 99-104, submitting declarations

10  37 CFR § 1.131 (Rule 131) by inventor Anthony Rozmanith and noninventor Egon Fabian in an

11  attempt to antedate Yurt, and submitting a thirty-page declaration under 37 CFR § 1.132 entitled

12  "Declaration of Philip Koopman, Ph.D." (hereinafter "First Koopman Declaration"), which

13  addresses the § 112 rejections and the prior-art rejections.

14      The nonfinal, third Office action ("Third Action")[13] is 109 pages long. At pages 72-108,

15  which provide the statements of the rejections, the examiner repeated the rejection based on

16  Filepp in view of well known practices (citing the supporting references) and other rejections and

17  adds new rejections based on additional references including Row, Paolini, Walter, Pocock, Baji,

---

[11]  The rejections based on Yurt applied to claims 93, 95, 96, 100, and 102-104.

[12]  Paper No. 24.

[13]  Paper No. 26.

- 4 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    Catros, and McCalley.[14] In addition, the examiner cited paragraphs 56-58 of the First Koopman

2    Declaration as support for a non-enablement rejection of claims 94, 95, 97, and 98. 3d Action at

3    72, para. 9. The examiner did not mention the Rule 131 declarations but failed to repeat and

4    therefore implicitly withdrew[15] the rejections of claims 93, 95, 96, 100, and 102-104 based on

5    Yurt. However, he newly rejected claim 11 for obviousness over Yurt in view of either Kandell

6    or Gargini. Id. at 86-88, paras. 19-20. Rather than following each statement of each ground of

7    rejection with his response to the relevant parts of Dr. Koopman's testimony, the examiner

8    devotes pages 8 to 71 to a separate discussion of that testimony. That discussion consists of

9    reproducing virtually the entire First Koopman Declaration a passage at a time and following

10   each quoted passage with the examiner's response (in bold).

11        Appellant's response[16] to the third Office action was accompanied by a "Second

12   Declaration of Philip Koopman, Ph.D." ("Second Koopman Declaration"),[17] which runs 200

13   pages (excluding exhibits). The length of this declaration is due to the fact that it quotes, a

14   passage at a time, virtually the entire Office action (including its quotations from the First

15   Koopman Declaration) and follows each passage with Dr. Koopman's comments.

---

[14]   At page 3, the examiner also relied on Rozmanith U.S. Patent 5,179,652.

[15]   The examiner stated that "[e]very rejection not expressly maintained is withdrawn."
3d Action at 72, para. 7.

[16]   Paper No. 28.

[17]   Paper No. 27.

Reexamination Control No. 90/005,742
Patent 5,253,341

1        The fourth and final Office action ("Final Action")[18] is 265 pages long, of which pages

2    232-64 provide the statements of the rejections.  The paragraph numbers the Answer assigns to

3    some of the rejections differ from the paragraph numbers used in the Final Action.  The examiner

4    confirmed that the Rule 131 declarations are effective to remove Yurt as a reference with respect

5    to claims 93, 95, 96, 99, 100, and 102-04 but not with respect to claim 11, the only claim

6    currently rejected over that reference.  Final Action at 202, para. 367.  The examiner held the

7    Second Koopman Declaration effective to overcome only the § 112, written description

8    rejections of claims 93-99 and 101 and the § 102(e) rejection of claim 103 over Pocock.  Id. at 5-

9    6, para. 7.  At pages 6-232, the examiner explained why the Second Koopman Declaration is

10    unconvincing as to the remaining rejections.  The length of this discussion is due to the fact that

11    it reproduces virtually the entire declaration a passage at a time and follows each quoted passage

12    with the examiner's commentary (in bold).

13        Several different versions of the appeal brief have been filed.  All versions except for the

14    brief filed on August 27, 2003 (hereinafter "Brief")[19] have been returned to appellant.  October 8,

15    2003, "Decision Denying Petition"[20] (referring to the brief now before us as the "third

16    submission").  Much of the Brief consists of a summary of all of the Office actions except the

17    first, the discussion of which (at pages 16-19) has been redacted.  Regarding the merits of the

18    rejections given in the Final Action, appellant simply asserts that the rejections set forth in the

---

[18]   Paper No. 29.

[19]   Paper No. 37.

[20]   Paper No. 38.

Reexamination Control No. 90/005,742
Patent 5,253,341

1     Final Action were addressed in appellant's responses to earlier Office actions and relies on a

2     table that correlates the page numbers (but not the paragraph numbers) of the Second Koopman

3     Declaration with the paragraph numbers employed in the Final Action. Brief at 57-58.

4         In the Answer,[21] which runs 220 pages, the statements of the rejections appear at pages 7-

5     26 and are assigned paragraph numbers (i.e., paras. 2-24) that differ from the paragraph numbers

6     employed in the Final Action and the Third Action. The § 103(a) rejection of claims 10 and 11

7     based on Paolini in view of Gargini and Official Notice was withdrawn at page 26, paragraph 31.

8     The Second Koopman Declaration is discussed at pages 40-220.

9         The Supplemental Appeal Brief filed on March 24, 2005, simply updates the

10     identification of the real party in interest.

11         Prior to docketing of this appeal, the reexamination file was returned to the examiner to

12     obtain clarification of some matters in the Brief and the Answer, including whether certain

13     previously asserted rejections that were not repeated in the answer have been withdrawn.[22] A

14     response was filed by the examiner[23] and then by appellant.[24] In that response appellant argues,

---

[21]   Paper No. 39.

[22]   Paper No. 40, mailed February 28, 2005.

[23]   Paper No. 42, mailed April 29, 2005. The examiner explained that the following rejections are not being maintained: (a) the § 112 rejection of claim 98 as lacking written description support; (b) the § 103(a) rejection of claim 11 based on Filepp in view of Row; (c) the § 103(a) rejection of claims 95 and 98 based on Baji in view of Sugiyama; (d) § 103(a) rejection of claim 11 based on Rozmanith '652 in view of "known practices"; and (e) the § 112 rejections of claims 95, 98, and 103. The examiner also confirmed that the § 103(a) rejection of claims 9-11 and 14 based on Filepp in combination with well known practices is being maintained.

[24]   Paper received May 24, 2005.

Reexamination Control No. 90/005,742
Patent 5,253,341

1    inter alia, that the examiner's citation of so many references against claims 9-11 and 14 is

2    contrary to In re Dembiczak, 175 F.3d 994, 50 USPQ2d 1614 (Fed. Cir. 1999), an issue we

3    address below.

4    **C. The state of the record**

5    As already noted, the Brief asserts that the rejections set forth in the Final Action were

6    addressed in appellant's responses to earlier Office actions and provides the aforementioned table

7    correlating the page numbers of the Second Koopman Declaration (which discusses the Third

8    Action) with the paragraph numbers of the Final Action. Brief at 57-58. The examiner did not

9    object to the form of the Brief and thus effectively treated the Second Koopman Declaration as

10    incorporated by reference therein, as will we.

11    Because the Office action that is discussed in the Second Koopman Declaration is the

12    Third Action, we are keying our discussion of the rejections to the paragraph and page numbers

13    used in the Third Action, which appear in bold in the Second Koopman Declaration. See, e.g.,

14    2d Koopman Decl. at 4 (citing **Office Action ¶ 6, Page 8**). Each cited paragraph and page

15    number of the Third Action is followed by numbered paragraphs (hereinafter "testimony

16    paragraphs") that (a) reproduce the corresponding passages from the First Koopman Declaration

17    and the examiner's responses thereto and (b) give Dr. Koopman's comments on the examiner's

18    responses. Thus, the citation of **Office Action ¶ 6, Page 8** at page 4 of the Second Koopman

19    Declaration is followed 15 at pages 4 to 7 by testimony paragraphs 8. These testimony paragraph

20    numbers can then be used to locate the corresponding discussion in the Final Action and the

Reexamination Control No. 90/005,742
Patent 5,253,341

Answer. Continuing with the same example, the examiner's responses to testimony paragraphs 8 to 15 appear in the Final Action at pages 6-9 and in the Answer at pages 40-43.[25]

We have looked only to the examiner's statements of the rejections (i.e., not to his discussions of the Koopman declarations) for statements of the prima facie cases for anticipation and obviousness.

**D. Appellant's due process argument**

In addition to arguing the merits of the various rejections, appellant asserts that

the examiner's practices of repeatedly iterating past assertions and arguments verbatim (sometimes repeating absolutely identical rejections to the same claims in the same office action); refusing even to acknowledge much of the evidence submitted by the applicants and continuously citing scores of new and only peripherally pertinent alleged prior art references have made it impossible to prosecute the re-examination and thwarted any meaningful appellate review, in violation of the Administrative Procedures Act and the regulations of the PTO[.]

Brief at 6-7. The afore-mentioned October 8, 2003, Decision Denying Petition (Paper No. 38), quoting MPEP § 1201 (8th ed., rev. 1, Feb. 2003),[26] explains that questions regarding the conduct

---

[25] Some of the responses given in the Answer are more extensive than the corresponding responses given in the Final Office Action. Compare, e.g., the response to testimony paragraph 11 given at page 42 of the Answer to the response given at page 7 of the Final Action. The Brief fails to specifically address the responses given in the Final Action or the Answer.

[26] The quoted portion of MPEP § 1201 reads:

The line of demarcation between appealable matters for the Board of Patent Appeals and Interferences (Board) and petitionable matters for the Commissioner of Patents and Trademarks should be carefully observed. The Board will not ordinarily hear a question which it believes should be decided by the Commissioner, and the Commissioner will not ordinarily entertain a petition where the question presented is an appealable matter. Decision at 4 n.2.

- 9 -

1    of an examiner are petitionable rather than appealable. Decision at 4 & n.2. Our review is

2    accordingly limited to the merits of the rejections now before us.

3    **E. Appellant's invention**

4    Appellant's invention is directed to a method and an apparatus whereby an end user

5    station (EUS) transmits a query to a remote server in order to obtain audio/visual (AV) data

6    and/or graphical/tabular information which resides at the server. '341 patent, col. 2, ll. 24-30.

7    Figure 1 is a system overview showing the details of EUS 10 ("the EUS"), which can be

8    one of a plurality of EUS's. The EUS includes a remote query communication system 12 that can

9    communicate with the global server network 29 in any of three different ways: (a) via a DDS

10    (direct dial service) telephone line 33 and an optional concentrator device 19 to the end user's

11    local server 11A; (b) via a CATV adapter 22, cable 26A, and local CATV service center 26 to

12    the CATV's local server 11B; and (c) via an auxiliary input device 16, radio frequency link 37,

13    and local auxiliary service center 18 to the auxiliary's local server 11C. Id. at col. 3, ll. 21-32.

14    In operation, the EUS transmits a query to the host/server for the purpose of initiating a

15    process in the host/server. Id. at col. 2, ll. 29-30. The server, which is more powerful than the

16    EUS, responds to the query by performing processes such as indexing into a very large database,

17    data compression, and high-speed processing to generate a response. Id. at col. 2, ll. 30-35. The

18    less powerful EUS performs appropriate inverse processing (including data decompression where

19    appropriate) on the response. Id. at col. 2, ll.35-38. Because most of the processing power

20    resides in the server, the system is referred to as "asymmetric." Id. at col. 2, ll. 39-44.

- 10 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1     The control and processing unit 48 (see Fig. 3) of the remote query and data retrieval

2    system may be an Intel 8086, 80286, 80386, 80486 or higher power Intel compatible

3    microprocessor or, alternatively, a Motorola 68000 series microprocessor. Id. at col. 6, ll. 22-27.

4    This control and processing unit operates under the control of an operating system such as MS-

5    DOS, PC-DOS, UNIX,[27] XENIX or other operating system. Id. at col. 6, ll. 27-29.

6     The more powerful host/server 11 can preferably be UNIX-based and should utilize a

7    CISC- or RISC-based "processor," id. at col. 3, ll. 36-38; col. 4, ll. 13-26,[28] such as an HP Apollo

8    Series 7000 with PA-RISC architecture. Id. at col. 3, ll. 38-40. The record before us does not

9    include any details of the HP Apollo Series 7000.

10     Various compression and decompression techniques are discussed, such as FRACTAL,

11    CCITT, and JPEG. Id. at col. 7, ll. 33. The '341 patent explains that in order to accommodate

---

[27] UNIX is an operating system for a wide variety of computers, from mainframes to personal computers, that supports multitasking and is ideally suited to multi-user applications. Que's Computer User Dictionary (Que's Dictionary) 461 (1990 ed.) (copy enclosed).

[28] The term "CISC" refers to a "complex instruction set computer," which is a central processing unit (CPU) that can recognize as many as 100 or more instructions, enough to carry out most computations directly. Que's Dictionary 106 (copy enclosed). "RISC" refers to a "reduced instruction set computer," which is a CPU in which the number of instructions the computer can execute is reduced to a minimum to increase processing speed. Id. at 388 (copy enclosed).

    The idea of a RISC architecture is to reduce the instruction set to a bare minimum, emphasizing the instructions that are used most of the time, and optimizing them for the fastest possible execution. The instructions left out of the chip must be carried out by combining the ones left, but because these instructions are needed far less frequently, a RISC processor usually runs 50 to 75 percent faster than its CISC counterpart.

    RISC processors are also cheaper to design, debug, and manufacture because they are less complex.

Id.

1    efficient compression and decompression of animated sequences (as in feature film video), the

2    technique of Differential (DFF) Image Compression (DIC) described by John Bridges in Dr.

3    Dobb's Journal #173 February 1991, page 38, et seq. (the Bridges reference) may utilized as part

4    of the decompression module. Id. at col. 7, ll. 34-40.  Improved (maximum) compression be

5    obtained by combining the DIC methodology for DFF frames with a high compression ratio

6    methodology for reference frames, such as the FRACTAL technique. Id. at col. 8, ll. 13-18.

7    Alternatively, a combination of compression technologies may be used "to communicate a

8    reasonable quality video single animated sequence over a lower bandwidth channel such as the

9    standard DDS phone lines, in real time, where the data rate is effectively 1600 bytes per second

10   or above." Id. at col. 8, ll. 18-23.

11   **F. The rejected claims**

12         Claims under reexamination are given their broadest reasonable interpretation consistent

13   with the patent disclosure. In re American Academy of Science Tech Center, 367 F.3d 1359,

14   1364, 70 USPQ2d 1827, 1830 (Fed. Cir. 2004).

15         The rejected claims include ten independent claims, viz., claims 9-11, 14, 93, and 100-04.

16   As already noted, claims 9-11 and 14 specify that the response received by the remote query and

17   data retrieval means from the remote host is compressed.  The remaining independent claims

18   specify that the response may be compressed or non-compressed.  Claim 9 reads:

19         9. Apparatus for querying and downloading data from a remote server
20   comprising:
21
22         end user means for formulating a query via a data input means and
23   inputting said query to remote query and data retrieval means;

- 12 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1              means for transmitting said query from said remote query and data

2    retrieval means to a remote host processor via a concentrator means;

3

4              said remote query and data retrieval system receiving a compressed

5    response to said query from said remote host via said input/output means, said

6    remote query and data retrieval system decompressing said compressed response

7    to said query, and displaying a presentation corresponding to said query response

8    on output means, wherein said remote host utilizes a RISC based processor and a

9    UNIX based operating system.

10

11    We are construing the phrase "said remote query and data retrieval system" (emphasis

12    added) in the third paragraph as referring to the "remote query and data retrieval means"

13    (emphasis added) recited in the first and second paragraphs. We note that because the end user

14    means formulates the query and inputs it to the "remote query and data retrieval means" for

15    transmission to "a remote host processor via a concentrator means," it is clear that the "remote

16    query and data retrieval means" is part of, rather than remote from, the end user means.

17    We are also construing the phrase "said input/output means" (emphasis added) in the third

18    paragraph, which has no antecedent, as "an input/output means" (emphasis added). Furthermore,

19    we understand the phrase "said remote host" in the third paragraph to be referring to "a remote

20    host processor," recited in the second paragraph.

21    The term "processor" can be read on a central processing unit (CPU), which consists of a

22    computer's internal storage, processing, and control circuitry, including the arithmetic-logic unit

23    (ALU) and the primary storage. Que's Dictionary at 82. The term "processor" is broader than

24    "microprocessor," which is an integrated circuit chip that contains the ALU and control unit of a

25    CPU. Id. at 293.

Reexamination Control No. 90/005,742
Patent 5,253,341

The corresponding language in claims 10, 11, and 14 is being construed in a similar manner.

The scope and meaning of claims 93-104 are addressed prior to the discussion of the rejections of those claims.

**G. The references relied on in the rejections[29]**

**1. U.S. Patents**

| | | |
|---|---|---|
| De Maine et al. (De Maine) | 3,656,178 | Apr. 11, 1972 |
| Giltner et al. (Giltner) | 4,386,416 | May 31, 1983 |
| Kandell et al. (Kandell) | 4,430,530 | Feb. 7, 1984 |
| Walter | 4,506,387 | Mar. 19, 1985 |
| Gargini et al. (Gargini) | 4,538,174 | Aug. 27, 1985 |
| Kirchner et al. (Kirchner) | 4,665,519 | May 12, 1987 |
| Catros et al. (Catros) | 4,679,079 | July 7, 1987 |
| Sugiyama et al. (Sugiyama) | 4,797,742 | Jan. 10, 1989 |
| McCalley et al. (McCalley) | 4,829,372 | May 9, 1989 |
| Cohen | 4,949,187 | Aug. 14, 1990 |
| Notenboom | 4,955,066 | Sep. 4, 1990 |
| Pocock et al. (Pocock) | 5,014,125 | May 7, 1991 |

---

[29]  The filing date of Yurt is being provided because appellant has is attempting to antedate it under 37 CFR § 1.131.

Reexamination Control No. 90/005,742
Patent 5,253,341

| | | | |
|---|---|---|---|
| 1 | Baji et al. (Baji) | 5,027,400 | June 25, 1991 |
| 2 | | | |
| 3 | LeGall et al. (LeGall) | 5,049,993 | Sep. 17, 1991 |
| 4 | | | |
| 5 | Yurt et al. (Yurt) | 5,132,992 | July 21, 1992 |
| 6 | | | (filed Jan. 7, 1991) |
| 7 | | | |
| 8 | Row et al. (Row) | 5,163,131 | Nov. 10, 1992 |
| 9 | | | |
| 10 | Filepp et al. (Filepp) | 5,347,632 | Sep. 13, 1994 |
| 11 | | | |

12      **2. The Gale articles** (cited in the order given in the third Office action at 75-76,

13 para. 14)

14      Irwin Greenstein, <u>Sun Intros Sub-$10,000 RISC Computer</u>, MIS Week, vol. 10,
15 n.16, p. 16(1) (Apr. 17, 1989).
16
17      <u>Hewlett Adds HP-UX 7.0, Two Unix RISCs, X400 for UNIX. . .</u>, Computergram
18 International, n. 1253 (Aug. 31, 1989) .
19
20      Mike Seither, <u>Pyramid's Network Server Offers 12 CPUs, up to 150 MIPS; an
21 Early Convert Hopes to Conquer the UNIX Market</u>, Mini-Micro Systems, v. 22, n. 2, p.
22 21(3) (Feb. 1989).
23
24      Ray Weiss, <u>MIPS Shows ECL RISC Superserver</u>, Electronic Engineering Times,
25 n. 563, p. 1(1) (Nov. 6, 1989).
26
27      <u>DEC Product Rollout Includes Ultrix Servers</u>, Computer Systems News, n. 425,
28 p. 10(1) (July 10, 1989).
29
30      Gary H. Anthes, <u>Multiple Terminals Can Do Super Work, Firm Says</u>, Federal
31 Computer Week, v. 3, n. 27, p. 8(2)  (July 3, 1989).
32
33      Paula Rooney, <u>DEC Pushes Price vs Performance</u>, EDN, v. 34, n. 14A, p. 5(2)
34 (Aug. 10, 1980).
35
36      George Briggs, <u>DG Unveils New Unix Version to Support Aviion Family</u>, MIS
37 Week, vol. 10, n. 10, p. 16 (March 6, 1989).
38

Reexamination Control No. 90/005,742
Patent 5,253,341

1        Wind River Systems Vxworks (TM) Realtime Operating System Bundled with
2        Concurrent Computer 6000 Series Hosts, News Release, p. 1 (Jan. 3, 1990).
3
4        Ron Wilson, Chip Set Introduces PC Builders to Multiprocessing World,
5        Computer Design, v. 29, n. 7, p. 117(1) (Apr. 1, 1990).
6
7        Brian Gillooly, Steam to Rise in 1990s Workstation Arena As Vendors Vie for
8        Supremacy, Computer Reseller News,  n. 337, p. 87(2)(Oct. 16, 1989).
9
10       Altos Expected to Debut Workstation That Operates Under Both DOS and Unix,
11       PC Week, v. 5, n. 25, p. 30(1) (June 21, 1988).
12
13       Patricia Keefe, Banyan, Oracle Team up on Server Option, Computerworld, v. 23,
14       n. 15, p. 14(1) (April 10, 1989).
15
16       Jean S. Bozman, Oracle Version 6.0 Covers the Distributed Data 'Bases,'
17       Computerworld, vol. 23, no. 26, p. 14(1) (June 26, 1989).
18
19       Juli Cortino, Motorola Plans Low-end Unix Network Server, PC Week, vol. 6,
20       n. 15, p. 13(1) (April 17, 1989).
21
22       AIM Technology Offers 0S-2 and Unix Benchmarks, Computer & Software News,
23       vol. 6, n. 28, p. 74(1) (July 11, 1988).
24
25       Martin Farncombe, A Parallel Future, EXE, vol. 4, n. 6, p. 48(5) (Nov. 1989).
26
27       Jeff Moad, The New Agenda for Open Systems, Datamation, vol. 36, no. 7,
28       p. 22(7) (Apr. 1, 1990).
29
30       David Methvin, Unix Frees Developors from RISC-specific Work, PC Week,
31       vol. 7, n. 13, p. S24(1) (Apr. 2,1990).
32
33       John Battelle, IPT Brings uShare Server to SCO Unix and Xenix, MacWEEK,
34       vol. 4, n. 14, p. 22(1) (Apr. 10, 1990).
35
36       Amy Cortese, Motorola Revs into Server Mart, Computerworld, vol. 24, n. 11,
37       p. 8(1)  (Mar. 12, 1990).
38
39       Barbara E. & John F. McMullen, AT&T Introduces Rhapsody for Business
40       Orchestration, Newsbytes, p. NEW03290033 (March 29,1990).
41

Reexamination Control No. 90/005,742
Patent 5,253,341

Tom Smith, AT and T Broadens Data Systems' Net Options; Company Offers X-Windows Support, Bolsters Connectivity of SB Minis and Terminal Subnets, Network World, vol. 6, n. 45, p. 43(2) (Nov. 13, 1989).

Mark Lapedus, Intel Enters Network File Servers, Electronic News, vol. 35, n. 1758, p. 14(1) (May 15, 1989).

Prime Offers Unix MPs Bought From Sequent, Electronic News, vol. 35, n. 1772, p. 17(1) (Aug, 21, 1989).[30]

Martin Marshall, MIPS Announces Two File Servers, Unix System V 4.0 ABI Agreement, InfoWorld, vol. 11, n. 44, p. 44(1) (Oct. 30, 1989).

Patricia Keefe, IBM UNIX Tthrust Carries Promise, Risk, Computerworld, vol. 24, n. 8, p. 1(2) (Feb. 19, 1990).

Joan M. Hosinski, UNIX Server Targets Commercial Uses, Government Computer News, vol. 8, n. 6, p. 31(1) (Mar. 20, 1989).

IBM'S RS/6000 Announcements, Computergram International, n. 1366 (Feb. 16, 1990).

Barbara Depompa, AT&T Intros Servers for Wide-ranging Networks, MIS Week, vol. 11, no. 15, p. 4(1) (April 9, 1990).[31]

**3. Other printed publications**

John Bridges, Differential Image Compression, Doctor Bob's Journal on CD-ROM 1-12 (Bridges).[32]

M.D. Carr, New Video Coding Standard for the 1990s, Electronics & Communication Engrg. Journal 119-24 (June 1990).

Donald K. Fink and Donald Christiansen, The Electronics Engineers' Handbook, p. 23-88 (3d ed. 1989).

---

[30] Copy provided by the examiner with Paper No. 42.

[31] Copy provided by the examiner with Paper No. 42.

[32] As noted above, the '341 patent gives the publication date as February 1991.

Reexamination Control No. 90/005,742
Patent 5,253,341

1          V. Punj, <u>Broadband Applications and Services of Public Switched Networks</u>,
2    35 IEEE Transactions on Consumer Electronics 106-12 (May 1989) (Punj).
3

4    **H. The § 112 rejection**

5          Claims 94 and 97 stand rejected under § 112, first paragraph, for lack of an enabling

6    disclosure. 3d Action at 72, para. 9; Final Action at 232, para. 11; Answer at 6 (no para.

7    number).[33]

8    **I. The art rejections**
9
10         The pending grounds of rejections can be grouped as follows (including citations to the

11    Third Action, Final Action, and Answer):

12        **1. Rejections based on Filepp**
13

14         • Claims 9-11 and 14 under 35 U.S.C. § 103(a) for obviousness
15    over Filepp in view of known practices, as evidenced by The Electronics
16    Engineers' Handbook, the Gale articles, De Maine, Carr, Giltner,
17    Notenboom, and LeGall. 3d Action at 75, para. 14; Final Action at 234,
18    para. 14; Answer at 7-8, para. 2.
19

20         • Claims 9, 10, 14 under § 103(a) over Filepp in view of Row. 3d
21    Action at 79, para. 17; Final Action at 237, para. 17; Answer at 9, para. 3.
22

23         • Claim 11 under § 103(a) over Filepp in view of Giltner. 3d
24    Action at 83, para. 18; Final Action at 241, para. 18; Answer at 12, para. 4.
25

---

[33] This ground of rejection, which previously applied against claims 94, 95, 97, and 98, 3d Action at 72, para. 9; Final Action at 232 para. 11, was not repeated as to claims 95 and 98 in the Answer and is therefore being treated as withdrawn as to those claims. Likewise, the § 112 rejection of claims 95, 98, and 103 for failure to satisfy the written description requirement, 3d Action at 73-74, paras. 11-12; Final Action at 233-34, paras. 12-13, was not repeated in the Answer and is being treated as withdrawn.

Reexamination Control No. 90/005,742
Patent 5,253,341

### 2. Rejections based on Yurt

• Claim 11 under § 103(a) over Yurt in view of Kandell. 3d Action at 86, para. 19; Final Action at 243, para. 19; Answer at 14, para. 5.

• Claim 11 under § 103(a) over Yurt in view of Gargini. 3d Action at 87, para. 20; Final Action at 244, para. 20: Answer at 14, para. 6.

### 3. Rejections based on Walter

• Claims 93, 95, 96, and 98-101 under § 102(b) for anticipation by Walter. 3d Action at 94, para. 34; Final Action at 249, para. 34; Answer at 17, para. 10.

• Claim 103 under § 103(a) over Walter in view of Kirchner. 3d Action at 106, para. 47; Final Action at 259, para. 46; Answer at 25, para. 21.

• Claim 103 under § 103(a) over Walter in view of Dr. Koopman's testimony. 3d Action at 102 (no para. no.); Final Action at 255; Answer at 22, para. 15.

### 4. Rejections based on Pocock

• Claims 93, 96, 100-02, and 104 under 102(e) for anticipation by Pocock. 3d Action at 96, para. 35; Final Action at 251-53, para. 35; Answer at 18, para. 11.

• Claims 95 and 98 under § 103(a) over Pocock in view of Catros. 3d Action at 103, para. 43; Final Action at 257, para. 42; Answer at 22, para. 17.

• Claims 95 and 98 under § 103(a) over Pocock in view of Sugiyama. 3d Action at 104, para. 45; Final Action at 258, para. 44; Answer at 24, para. 19.

Reexamination Control No. 90/005,742
Patent 5,253,341

• Claim 99 under § 103(a) over Pocock in view of McCalley. 3d Action at 107, para.49; Final Action at 260, para. 48; Answer at 26, para. 23.

• Claim 103 under § 103(a) over Pocock in view of Kirchner. 3d Action at 107, para. 48; Final Action at 259, para. 46; Answer at 25, para. 22.

• Claim 103 under § 103(a) over Pocock in view of Dr. Koopman's testimony. 3d Action at 101, para. 41; Final Action at 255, para. 40; Answer at 21, para. 14.

**5. Rejections based on Baji**

• Claims 93, 96, 100, 102, and 104[34] under § 102(e) for anticipation by Baji. 3d Action at 99, para. 39; Final Action at 253, para. 38; Answer at 20, para. 12.

• Claims 94 and 97 under § 103(a) over Baji in view of Catros. 3d Action at 103, para. 42; Final Action at 256, para. 41; Answer at 22, para. 16;.

• Claims 94 and 97 under § 103(a) over Baji in view of Sugiyama. 3d Action at 104, para. 44; Final Action at 257, para. 43; Answer at 23, para. 18.

• Claim 99 under § 103(a) over Baji in view of McCalley. 3d Action at 107, para. 49; Final Action at 260, para. 49; Answer at 26, para. 24.

• Claim 103 under § 103(a) over Baji in view of Kirchner. 3d Action at 105, para. 46; Final Action at 258, para. 45; Answer at 24, para. 20.

• Claim 103 under § 103(a) over Baji in view of Dr. Koopman's testimony. 3d Action at 100, para. 40; Final Action at 254, para. 39; Answer at 21, para. 13.

---

[34] Although claim 101 is included in the statement of the rejection, it is not addressed in the discussion of the rejection and is therefore not considered to be subject to the rejection.

Reexamination Control No. 90/005,742
Patent 5,253,341

**6. Rejections based on Cohen**

• Claims 93, 94, 96, 97 under § 103(a) over Cohen in view of Sugiyama. 3d Action at 91, para. 24; Final Action at 247, para. 24; Answer at 15, para. 7.

• Claims 93, 94, 96, 97 under § 103(a) over Cohen in view of Bridges and further in view of Punj. 3d Action at 92, para. 28; Final Action at 248, para. 28; Answer at 16 (no para. no.).

**J. General observations regarding the evidence**

The above-identified patents and publications are the only references identified in the statements of the rejections. Patents and publications which are not identified in the statements of the rejections but are mentioned in the examiner's discussion of the rejections or Dr. Koopman's testimony have not been considered. See MPEP § 706.02(j) (8th ed., rev. 5, Oct. 2006) ("Where a reference is relied on to support a rejection, whether or not in a minor capacity, that reference should be positively included in the statement of the rejection. See In re Hoch, 428 F.2d 1341, 1342 n.3, 166 USPQ 406, 407 n.3 (CCPA 1970)"). Accord Ex parte Movva, 31 USPQ2d 1027, 1028 n.1 (Bd. Pat. App. & Int. 1993).

The examiner's assertions of technical facts are being given weight only to the extent they are supported by the cited references. See In re Pardo, 684 F.2d 912, 917, 214 USPQ 673, 677 (CCPA 1982) ("Assertions of technical facts in areas of esoteric technology must always be supported by citation to some reference work recognized as standard in the pertinent art and the appellant given, in the Patent Office, the opportunity to challenge the correctness of the assertion or the notoriety or repute of the cited reference.") (quoting In re Ahlert, 57 CCPA 1023, 1027,

Reexamination Control No. 90/005,742
Patent 5,253,341

1    424 F.2d 1088, 1091, 165 USPQ 418, 420-21 (1970)).  However, the examiner's asserted

2    motivation for combining the reference teachings need not appear in the references themselves:

3           [A]n implicit motivation to combine exists not only when a suggestion
4           may be gleaned from the prior art as a whole, but when the "improvement"
5           is technology-independent and the combination of references results in a
6           product or process that is more desirable, for example because it is
7           stronger, cheaper, cleaner, faster, lighter, smaller, more durable, or more
8           efficient.
9

10   DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356, 1368, 80 USPQ2d 1641, 1651

11   (Fed. Cir. 2006).

12          The examiner does not deny that Dr. Koopman's background and experience (First

13   Koopman Decl. paras. 1-4) qualify him under Kumho Tire Co. v. Carmichael, 526 U.S. 137,

14   50 USPQ2d 1177 (1999), and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579,

15   27 USPQ2d 1200 (1993), to testify about the knowledge and level of ordinary skill of persons

16   working in the field of the invention as of appellant's filing date.  However, much of his

17   testimony regarding the obviousness rejections misses the mark because it fails to address the

18   rationale and merits of those rejections, namely, (1) whether one skilled in the art would have

19   been motivated to combine the teachings of the primary and secondary references for the reasons

20   proposed by the examiner and (2) whether the combined teachings satisfy the language of the

21   rejected claims.  Specifically, his testimony fails to take into account that a rejection for

22   obviousness can be based on combining reference teachings so as to solve a problem different

23   from the problem solved by the applicant.  See In re Kahn, 441 F.3d 977, 988, 78 USPQ2d 1329,

24   1337 (Fed. Cir. 2006) ("[T]he law does not require that the references be combined for the

1   reasons contemplated by the inventor.") (quoting In re Beattie, 974 F.2d 1309, 1312, 24 USPQ2d

2   1040, 1042 (Fed. Cir. 1992)). Instead, Dr. Koopman argues the nonobviousness of combining

3   the reference teachings in order to achieve appellant's disclosed purpose of providing a server

4   capable of handling AV (audio visual) data of the type disclosed in the '341 patent (including an

5   animated sequence data representing feature film video – col. 7, ll. 34-36), even though such AV

6   data is not required by the claims[35] or by the examiner's proposed combinations of reference

7   teachings. An example is the following discussion of cache memory, which is not recited in the

8   claims:

9         10. Workstations, and in particular, RISC workstations, at the time
10    of the Rozmanith ['341] application were notorious for their sensitivity to
11    specific programs being executed, with huge performance degredation to
12    be expected if applications did not fit into the relatively small cache
13    memories of the day. Cache memory technology required very fast static
14    RAM chips that were expensive, in short supply, and very difficult to get
15    to work robustly. Similarly, CISC (Intel 80386 computers) usually had no
16    caches, while the 80486 had a small on-chip cache. In contrast,
17    mainframes could afford sizeable amounts of high-speed memory and
18    cache to speed processing. Worse, AV applications are, in fact, well-
19    known to have poor performance for small cache sizes due to the high
20    amount of data moved through the system in real time, making use of a
21    microprocessor based RISC or CISC server highly suspect.

23   1st Koopman Decl. at 5, para. 10 (emphasis added). See also id. at 6, para. 11 (asserting that the

24   references cited by the examiner "do not demonstrate that utilizing either a RISC or CISC (i.e.,

25   Intel's then-existing 80x86-based processor) would have been feasible for the instant

26   application") (emphasis added). In addition, Dr. Koopman's testimony about the individual

---

[35] The closest the claims come to reciting such AV data is the recitation of "an animation sequence" in claim 96, which does not specify that it represents feature film video.

Reexamination Control No. 90/005,742
Patent 5,253,341

1    references is frequently limited to the specific passages cited by the examiner rather than

2    addressing the reference as a whole.

3        Finally, Dr. Koopman's conclusory testimony will be given weight only to the extent it

4    has support in the documentary evidence.  See Rohm & Haas. v. Co. v. Brotech Corp., 127 F.3d

5    1089, 1092, 44 SPQ2d 1459, 1462 (Fed. Cir. 1997):

6                While an expert may testify to the ultimate issue in a case without
7        giving the basis for that opinion, Fed. R. Evid. 704, 705, nothing in the
8        rules requires a fact finder to accept this conclusion.  In Symbol
9        Technologies [v. Opticon, Inc., 935 F.2d 1569, 1582, 19 USPQ2d 1241,
10      1250 (Fed. Cir. 1991)], this court explained the distinction between a
11      proffer of evidence and the sufficiency of the proffered evidence: "In short,
12      [the patentee] was permitted to rest its prima facie case on [the] expert
13      testimony, including charts, that the patents were infringed, and the
14      District Court was free to accept or reject that evidence."  935 F.2d at
15      1576.  Nothing in the rules or in our jurisprudence requires the fact finder
16      to credit the unsupported assertions of an expert witness.
17
18    See also In re Wright, 999 F.2d 1557, 1563, 27 USPQ2d 1510, 1514 (Fed. Cir. 1993)("each of

19    these affidavits fails in its purpose because each merely contains unsupported conclusory

20    statements as to the ultimate legal question").

21    **K. The allegations of commercial success**

22        A determination of obviousness requires consideration of any objective evidence of

23    nonobviousness.  See In re Huang, 100 F.3d 135, 138, 40 USPQ2d 1685, 1687-88 (Fed. Cir.

24    1996):

25        The ultimate determination as to whether or not an invention is obvious is
26      a legal conclusion based on underlying factual inquiries including: (1) the
27      scope and content of the prior art; (2) the level of ordinary skill in the art;
28      (3) the differences between the claimed invention and the prior art; and
29      (4) objective evidence of nonobviousness. Graham v. John Deere Co.,

- 24 -

1       383 U.S. 1, 17-18, 148 USPQ 459, 467 (1966).

2

3    Objective evidence of nonobviousness includes evidence of commercial success, such as

4    licensing agreements.  In re GPAC Inc., 57 F.3d 1573, 1580, 35 USPQ2d 1116, 1122 (Fed. Cir.

5    1995).

6       As evidence that the claimed invention has been extensively licensed, appellant offers the

7    May 22, 2001, declaration by Anthony Brown, President of TechSearch, L.L.C., at that time the

8    owner of the '341 patent.  Mr. Brown testified:

9       2.  During the past twenty four (24) months, the '341 patent has
10   been licensed on a fully paid-up basis to fifty four (54) companies having
11   combined annual sales in excess of one hundred fifty billion
12   ($150,000,000,000).
13      3.  Licenses have even been negotiated and granted during this
14   reexamination proceeding, which indicates to me a high level of
15   recognition of the value and importance of the patented invention.
16      4.  Although the precise terms of the licenses are confidential, at
17   the requests of the licensees, the licenses covered all the claims of the '341
18   patent (that is, claims 1-16 as originally issued) and were entered into as a
19   result of the licensees' recognition that all claims – including dependent
20   claims – covered the activities of the licensees.  This nexus is apparent
21   from the fact that the fifty four (54) licensees come from a wide range of
22   industries (from airlines to financial services), with the only common
23   feature being the licensees' use of the patented technology.
24      5.  In my view, many thousands of web sites use the invention as
25   defined in the amended and newly submitted claims, which also shows the
26   commercial success of the invention claimed.  This success has been
27   further established by the fact that more than $1.875 million in royalties
28   and/or settlements have been paid to TechSearch for the rights it has
29   granted under all claims of the '341 patent.
30
31   Brown Decl. at 1-2, paras. 2-5.

Reexamination Control No. 90/005,742
Patent 5,253,341

1      A party relying on licensing activities as evidence of unobviousness must demonstrate a

2    nexus between those activities and the subject matter of the rejected claims. See GPAC, 57 F.3d

3    at 1580, 35 USPQ2d at 1122:

4          Licenses taken under the patent in suit may constitute evidence of
5          nonobviousness; however, only little weight can be attributed to such
6          evidence if the patentee does not demonstrate "a nexus between the merits
7          of the invention and the licenses of record." Stratoflex [Inc. v. Aeroquip
8          Corp.], 713 F.2d [1530,] 1539, 218 USPQ [871,] 879 [(Fed. Cir. 1983)];
9          see Demaco [Corp. v. F. Von Langsdorff Licensing Ltd.], 851 F.2d [1387,]
10         1392, 7 USPQ2d [1222,] 1226 [(Fed. Cir. 1988)].
11
12   The GPAC court held that "[b]ecause, in affidavits reciting the licensing history of the '111

13   patent, GPAC did not establish which claim(s) of the patent the licensing program incorporates,

14   GPAC has not shown that licensing of Natale's invention arose out of recognition and acceptance

15   of the subject matter claimed in the '111 patent." GPAC, 57 F.3d at 1580, 35 USPQ2d at 1122.

16   Furthermore,

17        affirmative evidence of nexus [is required] where the evidence of
18        commercial success presented is a license, because it is often "cheaper to
19        take licenses than to defend infringement suits." EWP Corp. v. Reliance
20        Universal Inc., 755 F.2d 898, 908 [225 USPQ 20, 26] (Fed. Cir. 1985).
21        . . . Without a showing of nexus, "the mere existence of . . . licenses is
22        insufficient to overcome the conclusion of obviousness" when there is a
23        strong prima facie case of obviousness. SIBIA Neurosciences, Inc. v.
24        Cadus Pharm. Corp., 225 F.3d 1349, 1358 [55 USPQ2d 1927, 1933] (Fed.
25        Cir. 2000).
26
27   Iron Grip Barbell Co. v. USA Sports, Inc., 392 F.3d 1317, 1324, 73 USPQ2d 1225, 1230 (Fed.

28   Cir. 2004).

29      The Brown declaration falls short of demonstrating the required nexus in several respects.

30   First, it fails to establish that the licensing agreements are specifically directed to the subject

Reexamination Control No. 90/005,742
Patent 5,253,341

1    matter recited in any of the claims currently rejected for obviousness. All of the independent

2    claims of the '341 patent (i.e., claims 1-3 and 7) were cancelled by appellant in response to the

3    First Action, with dependent claims 9-11 and 14 being (a) rewritten in independent form to

4    include all of the limitations of canceled claim 7 and (b) also being amended by changing

5    "compressed or non-compressed" to "compressed." Response to February 23, 2001, Office

6    Action in Reexamination, at 1-4 and 44. The remaining claims rejected for obviousness (i.e.,

7    claims 93-104) were added in appellant's supplemental response to the first Office action.

8    "Supplemental Response to February 23, 2001 Office Action and May 22, 2[0]01 Interview in

9    Reexamination" at 4-8. Even assuming, as Brown asserts, that fifty-four of the licensing

10    agreements apply to all of patent claims 1-16, including the dependent claims, we are not

11    prepared to assume that those licenses are specifically based on features recited in dependent

12    claims 9-11 and 14. This deficiency also applies to the licenses obtained subsequent to

13    commencement of this reexamination proceeding, because the declaration neither asserts that the

14    licensing agreements are directed to the new and amended claims nor specifically identifies the

15    claims which are covered by those agreements.

16        Moreover, appellant has failed to provide sufficient facts to establish that the "licenses

17    arose out of recognition and acceptance of the patent," GPAC, 57 F.3d at 1580, 35 USPQ2d at

18    1122, rather than simply from a desire to avoid the expense of infringement litigation. Iron Grip

19    Barbell, 392 F.3d at 1324, 73 USPQ2d at 1230; EWP, 755 F.2d at 908, 225 USPQ at 26.

20        Finally, even assuming for the sake of argument that the Brown declaration establishes

21    some degree of commercial success of the claimed subject matter, that success is clearly

Reexamination Control No. 90/005,742
Patent 5,253,341

1    outweighed by the strong prima facie case for obviousness, discussed below. SIBIA

2    Neurosciences, 225 F.3d at 1358, 55 USPQ2d at 1933.

3    **L.  The level of skill in the art**

4    There is no testimony specifically directed to the educational level or years of work

5    experience of a person having ordinary skill in the art, which are relevant to one of the

6    fundamental factual determinations to be made in an obviousness analysis.  Graham, 383 U.S.

7    at 17-18, 148 USPQ at 467.  As a result, the level of ordinary skill must be inferred from the

8    references themselves. See In re Oelrich, 579 F.2d 86, 91, 198 USPQ 210, 214 (CCPA 1978)

9    ("the PTO usually must evaluate both the scope and content of the prior art and the level of

10    ordinary skill solely on the cold words of the literature"); GPAC, 57 F.3d at 1579, 35 USPQ2d at

11    1121 (Board did not err in adopting the approach that the level of skill in the art was best

12    determined by the references of record).

13    **M.  The rejections based on Filepp**

14
15    **(1)  The Filepp disclosure**

16    Filepp explains that interactive computer networks are known in which multiple users,

17    each at a remote terminal, log onto a host computer having a data and software resource that

18    sequentially receives the users' data processing requests, executes them and supplies responses

19    back to the users.  Filepp, col. 1, ll. 26-29.  However, a result of requiring the host computer to

20    satisfy all the user data processing requests is that processing bottle-necks arise at the host,

21    causing slowdowns in network response time and requiring an expansion in computing power

22    (i.e., bigger and more complex computer facilities) in order to accommodate increases in the

Reexamination Control No. 90/005,742
Patent 5,253,341

1   number of users to be served. Id. at col. 1, ll. 36-46. Filepp's system reduces processing

2   demands on the host computer by having the host computer send "objects"

3           that have been specially structured to include display data, control data and
4           program instructions for supporting the applications at the network reception
5           systems, the objects being pre-created, parceled units of information that may be
6           distributed and stored at lower levels in the network[,] e.g., at the reception
7           system, so as to reduce processing demand on the network higher element[s], and
8
9           thereby permit the higher elements to function primarily as elements for
10          maintaining and supplying the database information.
11
12   Id. at col. 2, l. 61 to col. 3, l. 3.
13
14          Referring to Figure 2 of Filepp, an interactive network 10 uses a layered structure

15   including an information layer 100, a switch/file server layer 200 (including file server 205), and

16   a cache/concentrator layer 300. Id. at col. 4, ll. 19-22. This structure maintains active

17   application databases and delivers requested parts of the databases on demand to the plurality of

18   reception systems (RSs) 400 in reception layer 401. Id. at col. 4, ll. 22-25. Each of the

19   cache/concentrator units 302 in cache/ concentrator layer 300 serves a plurality of reception

20   systems 400 units over lines 301. Id. at col. 4, ll. 25-28.

21          Each reception system 400 includes a personal computer 405 having a CPU 410 including

22   a microprocessor (e.g., an INTEL X'86 microprocessor), companion RAM and ROM memory

23   and other associated elements, a monitor 412 with screen 414, and a keyboard 424. Id. at col. 4,

24   ll. 44-50.

25          Each reception system 400 is capable of communication with the host system to receive

26   information containing either of two types of data, namely objects and messages. Id. at col. 5, ll.