Reexamination Control No. 90/005,742
Patent 5,253,341

1    3-6. Objects have a uniform, self-defining format known to the reception system 400 and include

2    data types, such as interpretable programs and presentation data for display at monitor screen 414

3    of the user's personal computer. Id. at col. 5, ll. 6-10. Figure 3b shows an example of a page of

4    data displayed on screen of reception system 400.

5            Since much of the application processing formerly done by a host computer in previously

6    known time-sharing networks is now performed at the user's reception system 400, the higher

7    elements of network 10, particularly layer 200 (including file server 205), have as their primary

8    functions the routing of messages, serving of objects, and line concentration. Id. at col. 6,

9    ll. 29-34.

10           The information received by reception system 400 from interactive network 10 includes a

11    compression descriptor segment, which contains information needed for the decompression of

12    objects which have been compressed by network 10. Id. at col. 15, ll. 35-37. This segment is a

13    formalization of parameters to be used by a decompression routine residing at reception system

14    400, using, for example, the Huffman encoding well known in the art. Id. at ll. 35-40.

15           Filepp explains that "[t]he reception system 400 software is the interface between the user

16    of personal computer 405 and interactive network 10" and that "[t]he object of reception system

17    software is to minimize mainframe processing, minimize transmission across the network, and

18    support application extendibility and portability." Id. at col. 82, ll. 16-21 (emphasis added).

19    Filepp does not describe interactive computer network 10 (which performs the mainframe

20    processing) as employing a RISC- or CISC-based processor or as being UNIX-based.

- 30 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1  **(2) Comparing claims 9-11 and 14 to Filepp**

2

3  Claims 9-11 and 14 stand rejected under 35 U.S.C. § 103(a) for obviousness over Filepp

4  in view of "well known practices," as evidenced by The Electronics Engineers' Handbook, the

5  numerous Gale articles, De Maine, Carr, Giltner, Notenboom, and LeGall.

6  The preambles of claims 9, 10, and 11 recite a "remote server," while the body of each

7  claim more broadly recites a "remote host processor," also referred to as "said remote host."[36]

8  The preambular "remote server" recitation will not be treated as further limiting "remote host

9  processor," because in these claims "the body of the claim fully and intrinsically sets forth

10  the complete invention, including all of its limitations, and the preamble offers no distinct

11  definition of any of the claimed invention's limitations, but rather merely states . . . the

12  purpose or intended use of the invention." Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d

13  1298, 1305, 51 USPQ2d 1161, 1166 (Fed. Cir. 1999). In any event, the preambular "remote

14  server" reads on Filepp's file server 205, upon which the examiner reads the claimed "remote

15  host processor."

16  Comparing claim 9 to Filepp's Figure 2, the examiner explains why he believes Filepp

17  satisfies all of the claim language with the exception of the last clause ("wherein said remote host

18  utilizes a RISC based processor and a UNIX based operating system"). 3d Action at 77,

---

[36] In a computer network, the "host" computer is the computer that performs centralized functions, such as making program or data files available to workstations in the network. Que's Dictionary 223 (copy enclosed). In a local area network, a "server," which is synonymous "network server," is a computer that provides services for the users of a network; the server receives requests for peripheral services and manages requests so that they are answered in an orderly, sequential manner. Id. at 414 (copy enclosed).

Reexamination Control No. 90/005,742
Patent 5,253,341

1   para. 15(a)-(d); Final Action at 235-36, paras. 15(a)-(d).   Specifically, he reads the claimed "end

2   user means for formulating a query via a data input means and inputting said query to remote

3   query and data retrieval means" on reception system 400 as discussed at column 73, lines 53-68,

4   which he reproduces in part as follows:

5           Through this interaction, the user is able to input data into fields
6           provided as part of the display, or may individually select choices causing
7           a standard or personalized page to be built . . . for display on the monitor
8           of personal computer 405. . . . For example, the user may select a
9           particular option, such as opening on closing window partition 275, which
10          is present on the monitor and follow the selection with a completion key
11          stroke, such as ENTER.
12
13  3d Action at 77, para. 15(a); Final Action at 235, para. 15(a).

14          Dr. Koopman does not deny that the claimed "end user means" and "remote query and

15  data retrieval means" read on reception system 400 or that the reception system has "data input

16  means," such a keyboard 424.  Instead, he appears to arguing the cited passage does not describe

17  using the input means of the reception system 400 to formulate a request for an object from

18  interactive network 10:

19          The portion of Filepp cited by the examiner does not teach inputting the
20          request to remote query and data retrieval means as alleged.  Moreover, the
21          examiner has omitted a key sentence of the cited passage, namely col. 73
22          lines 57-64, which states that activity responsive to the inputs occurs at a
23          **client computer RS 400**, which is not a remote query and data retrieval
24          means.  There is no specific disclosure of inputting a request to a remote
25          query and data retrieval means.  Moreover, because Filepp teaches the use
26          of native code modules that are run on client machines, the default
27          assumption for execution where not otherwise stated is on client machines,
28          not a remote machine.  Additional disclosure of objects and interaction
29          screens being entirely local to a client machine can be found in col. 87
30          lines 5-14 of Filepp.
31

- 32 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    2d Koopman Decl. at 160-61, para. 344. The passage in column 87 to which Dr. Koopman refers

2    explains that the object may reside in various locations in reception system 400, such as in RAM

3    or on a disk 424. However, whether or not the passage cited by the examiner describes using the

4    input means (e.g., keyboard 424) to formulate a request for an object from the interactive

5    network, it is clear from the other passages that the data input means is to be used to formulate

6    such requests. See, e.g., Filepp. col. 5, ll. 41-44 ("objects make up one or more partitioned

7    applications, and are retrieved on demand by a user's RS 400 for interpretive execution and

8    selective storage"). Dr. Koopman's testimony on this point, as well as on many others, lacks

9    probative value because it is limited to the specific reference language cited by the examiner

10    rather than addressing the reference as a whole.

11        Turning now to the next limitation, the examiner, without contradiction by Dr. Koopman,

12    reads the recited "means for transmitting said query from said remote query and data retrieval

13    means to a remote host processor via a concentrator means" on the means for allowing RS 400 to

14    communicate with network 10. 3d Action at 77, para. 15(b); Final Action at 235-36, para. 15(b).

15    As shown in Figure 2, this communication means includes cache/concentrator layer 300

16    (including cache/concentrators 302), which transmits a query via line 301 to switch/file server

17    layer 200 (including file server 205), which in turn is connected via lines 210 to information

18    layer 100 (including, e.g., a high function system 110).

19        Regarding the claim's requirement that "the remote query and data retrieval means

20    receiv[es] a compressed response to said query from said remote host via said input/output

Reexamination Control No. 90/005,742
Patent 5,253,341

1    means," the examiner explains that the retrieved object includes a compression descriptor

2    segment that identifies the type of compression applied to the object data by interactive

3    network 10, citing column 15, lines 34-53. Final Action at 237, para. (c).[37] The examiner further

4    explains that the "compression descriptor segment contain[s] information needed for

5    decompression at the reception system of objects compressed in the interactive network," id.,

6    which we understand to mean that RS 400 performs decompression and thus satisfies the claim's

7    requirement that "said remote query and data retrieval system decompress[es] said compressed to

8    said query." Thus, even though, as noted by Dr. Koopman, 2d Koopman Decl. at 167, para. 353,

9    the examiner's statement of the rejection fails to assert that the "decompressing . . . said

10   compressed response" limitation reads on Filepp, it is clear why the examiner believes this is the

11   case. Furthermore, the examiner's failure to expressly assert that this claim language is satisfied

12   by Filepp does not provide sufficient support for Dr. Koopman's assertion that this limitation "is

13   not disclosed by the references," id., an assertion which must be based on an evaluation of Filepp

14   as a whole, including any reasonable inferences to be drawn therefrom.

15          The examiner reads the step of "displaying a presentation corresponding to said query

16   response on output means" on the displaying step that is described in the abstract and at

17   column 2, lines 52-54 ("the invention includes method and apparatus for providing interactive

18   applications containing text and graphics at the monitor of a personal computer"). 3d Action

19

---

[37] The 3d Action at 77-78, paragraph (c) cites column 15, lines 35-41.

Reexamination Control No. 90/005,742
Patent 5,253,341

1   at 78; Final Action at 236. Dr. Koopman's denial that the displayed text and graphics correspond

2   to the query response, 2d Koopman Decl. at 167-68, para. 354, ignores the fact that the objects

3   received by RS 400 from the interactive network 10 (Filepp, col. 5, ll. 40-44) "carry application

4   programs and information for display at monitor screen 414 of RS 400." Id. at col. 5, ll. 56-57.

5       For the foregoing reasons, we agree with the examiner that the only language of claim 9

6   that is not satisfied by Filepp is "wherein said remote host utilizes a RISC based processor and a

7   UNIX based operating system."

8       Claims 10, 11, and 14 differ from claim 9 by replacing its ultimate "wherein" clause with

9   the following "wherein" clauses, which do not read on Filepp:

10       (a) Claim 10 -- "wherein said remote host utilizes a CISC based processor and a UNIX

11   based operating system."

12       (b) Claim 11 -- "said compressed response is compressed utilizing at least two

13   compression techniques."

14       (c) Claim 14 -- "wherein said remote server resides on a compatible network in which

15   CISC and RISC based processors operating with a UNIX based operating system communicate in

16   a windowing environment."

17       As noted above, the term "processor" in the phrases "RISC based processor" and "CISC

18   based processor" encompasses but is not restricted to a microprocessor.

19
20
21
22
23

Reexamination Control No. 90/005,742
Patent 5,253,341

1          **(3) Claims 9-11 and 14 -- obvious over Filepp in view of well known practices?**

2

3               (a) <u>The evidence of "well known practices"</u>

4       As evidence that the features of claims 9-11 and 14 which are missing from Filepp

5 represent "well known practices," the examiner cites page 23-88 of <u>The Electronics Engineers'</u>

6 <u>Handbook</u>, the twenty-nine Gale articles, De Maine, Carr, Giltner, Notenboom, and LeGall.

7 3d Action at 75-76, para. 14; Final Action at 234-35, para. 14. The discussion of the rejection

8 (3d Action at 78-79, para. 16; Final Action at 236-37, para. 16) does not explain which

9 references apply to which claim limitations. However, it is evident from a perusal of these

10 references that <u>The Electronics Engineers' Handbook</u> and the Gale articles are relied on for their

11 disclosures of UNIX, CISC, and RISC servers and workstations and thus are pertinent to claims

12 9, 10, and 14, whereas the remaining references (i.e., De Maine, Carr, Giltner, Notenboom, and

13 LeGall) disclose video compression techniques and thus pertain to claim 11.

14               (b) <u>The rejection of claims 9, 10, and 14 (UNIX, RISC, and CISC limitations)</u>

15       The examiner 's reason for citing <u>The Electronics Engineers' Handbook</u> and the twenty-

16 nine Gale articles, which disclose UNIX, RISC, and CISC servers and workstations, was to

17 establish a general trend in the industry:

18        UNIX based host systems or servers systems were widely used in the
19        implementation of remote host systems at the time of the filing date due to
20        <u>platform independence</u> and <u>multi user capability</u> of the UNIX operating
21        system. As to the RISC and CISC microprocessor[,] it would have been
22        obvious to replace a board CPU with a microprocessor to take advantage
23        of the scalability and the rapid increase in processing power that the
24        microprocessor had achieved[;] further it was a general trend in the
25        industry.

26

- 36 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1  3d Action at 78-79, para. 16; Final Action at 236-37, para. 16 (emphasis added).[38]  Ordinarily,

2  the citation of cumulative references is to be avoided. As explained in § 706.02 of the MPEP

3  (8th ed., rev. 5, Oct. 2006), under the heading "Choice of Prior Art; Best Available," "[p]rior art

4  rejections should ordinarily be confined strictly to the best available art" (subject to several

5  exceptions which do not apply here[39]) and "[m]erely cumulative rejections . . . should be

6  avoided." Id. See also In re Herrick, 344 F.2d 713, 716, 145 USPQ 400, 401 (CCPA 1965):

7   Regarding claim 1, the most reasonable interpretation of the board's
8   statement leads to the conclusion that there is, in fact, the astounding total
9   of twenty-four separate rejections of the claim. As to claims 2 and 3, there
10  is no meaningful way to tell how many rejections have been made,
11  because of the board's use of the disjunctive conjunction 'and/or.' The
12  number of rejections of claims 4, 5, 6 and 8 is likewise indefinite, due to
13  the use of the word 'any,' but the minimum number is eleven. A rejection
14  so stated defeats the intent and purpose of 35 U.S.C. § 132.
15   The form of the rejections would seem to indicate that many of the
16  references were considered merely cumulative. And yet, the examiner's
17  answer and the solicitor's brief describe and analyze each reference in
18  some detail. Such a state of affairs places this court in a very real
19  quandary. Are we to choose one individual rejection for each claim and
20  turn the entire appeal on the correctness of those rejections? Or are we to
21  work our way step-by-step through each rejection in the hope of finding
22  one we can sustain? Neither alternative is satisfactory from the standpoint
23  of the public interest.
24
25  On the other hand, it is appropriate to rely on cumulative references to show the existence of a

26  technological trend. See Kansas Jack, Inc. v. Kuhn, 719 F.2d 1144, 1150, 219 USPQ 857, 860

---

[38]   We agree with Dr. Koopman that the term "board CPU" apparently refers to a non-microprocessor CPU. 2d Koopman Decl. at 162, para. 346.

[39]   These exceptions are: "(A) the propriety of a 35 U.S.C. § 102 or 103 rejection depends on a particular interpretation of a claim; (B) a claim is met only in terms by a reference which does not disclose the inventive concept involved; and (C) the most pertinent reference seems likely to be antedated by a 37 CFR 1.131 affidavit or declaration." MPEP § 706.02.

Reexamination Control No. 90/005,742
Patent 5,253,341

1   (Fed. Cir. 1983) (fact that teachings relied upon to show obviousness were repeated in a number

2   of references strengthened conclusion of obviousness). That is clearly the situation before us,

3   although the examiner could have made the same point with fewer Gale articles. That is, rather

4   than being cited for the details of the RISC, CISC, and UNIX servers and workstations discussed

5   therein, the Gale articles are cited collectively to show that such servers and workstation were

6   known in the art and in fact commercially available prior to the filing date of appellant's '341

7   patent. Dr. Koopman's chief criticism of the Gale articles, which is that they contain too little

8   information to be enabling, see, e.g., 2d Koopman Decl. at 26, para. 52 ("A reference that has no

9   pertinent technical content is not meaningful prior art."), fails to consider the Gale articles in this

10  light. Also, his testimony fails to take into account the high level of skill in the art that is implied

11  by the brevity of the discussion in the '341 patent regarding the use of a UNIX-based server

12  employing a RISC or CISC processor:

13       The server 11 will typically include special purpose, high speed processing and
14       large capacity multi-distributed storage capability. The server 11 will typically be
15       more powerful than the EUS 10, can preferably be UNIX based, and should utilize
16       a CISC or RISC based processor which is capable of utilizing compression
17       software such as fractal-transform technology, manufactured and marketed by
18       Iterated Systems, Inc. of Norcross, Ga., and which can be enhanced by co-
19       processors. In addition, the host processor should be able to operate in a
20       windowing environment. Other compression/decompression packages such as
21       JPEG and DFF (Differential Image Storing) may also be utilized by the
22       host/server 11 of the present invention.
23
24  '341 patent, col. 4, ll. 13-26 (emphasis added). The '341 patent thus presumes that a person

25  having ordinary skill in the art of interactive computer networks, without the exercise of undue

26  experimentation, would have been able to select or design a UNIX-based server which has a

Reexamination Control No. 90/005,742
Patent 5,253,341

1    RISC or CISC processor and is capable of (1) performing one or more of the above-specified

2    compression techniques and (2) operating in a windowing environment. That the examiner

3    agrees with this conclusion about the high level of skill is evidenced by the absence of a rejection

4    of any of claims 9, 10, and 14 under § 112, first paragraph, for being based on a non-enabling

5    disclosure. Appellant cannot, on the one hand, be given the benefit of a high level of skill in the

6    art in order to comply with the enablement requirement of § 112, first paragraph, and, on the

7    other hand, argue a lower level of skill for judging obviousness over the prior art.

8         A result of this high level of skill in the art is that the rejection of claims 9, 10, and 14 is

9    sustainable if the cited secondary references would have suggested to the artisan that UNIX,

10    RISC, and CISC technology would have been desirable and suitable for use as Filepp's file

11    server 205. The examiner's assertion that the UNIX operating system was recognized as offering

12    the advantages of platform independence and multi-user capability is supported by his citation of

13    page 23-88 of <u>The Electronics Engineers' Handbook</u>, which reads in pertinent part:

14         Operating systems are generally developed for a specific CPU architecture
15    or for a family of CPUs. However, one operating system, the UNIX system (a
16    trademark of AT&T), has been transported to a number of different
17    manufacturers' systems and is in very wide use today. UNIX was developed as a
18    unified, interactive, multiuser system. It consists of a kernel that schedules tasks
19    and manages data, a shell that executes user commands—one at a time or in a
20    series called a pipe—and a series of utility programs.
21
22    Although Dr. Koopman asserts that "[i]t was not obvious to use a UNIX based remote host

23    system," 2d Koopman Decl. at 162, para. 345, he does not actually deny that is would have been

24    obvious in view of <u>The Electronics Engineers' Handbook</u> to implement Filepp's file server 205 as

25    a UNIX-based server. Instead, he denies that it would have been obvious to use a UNIX-based

Reexamination Control No. 90/005,742
Patent 5,253,341

1   server to handle AV data of the type which is disclosed in appellant's '341 patent but not recited

2   in the rejected claims, see, e.g., 2d Koopman Decl. at 17, para. 8, an argument which is not

3   responsive to the rationale of the rejection.

4        As already noted, the examiner contends there were several different motivations for

5   implementing Filepp's file server with a RISC or CISC microprocessor: (a) "scalability"; (b) "the

6   rapid increase in processing power that the microprocessor had achieved"; and (c) "a general

7   trend in the industry." 3d Action at 78-79, para. 16; Final Action at 236-37, para. 16.[40] We are

8   unable to determine the merits of the "scalability" argument because that term is not defined or

9   adequately discussed in the record.[41] Dr. Koopman responded to the asserted "processing power"

10  motivation by arguing that "[r]eplacing a non-microprocessor CPU with a microprocessor CPU

11  would only be reasonable if both versions had the same instruction set," 2d Koopman Decl. at

12  162, para. 346, and that "[a]t the time that Rozmanith filed it was ordinarily the case that a

13  mainframe [i.e., non-microprocessor] implementation of an instruction set would be a more

14  powerful computer than a microprocessor based implementation." Id. This argument is

15  unconvincing because we are not persuaded that a RISC- or CISC-microprocessor

16  implementation of Filepp's non-RISC, non-CISC processor must use the same instruction set.

17  Dr. Koopman's argument that "microprocessor based versions of a machine were typically

---

[40] Dr. Koopman correctly notes that claims 9, 10, and 14 do not recite "microprocessors." 2d Koopman Decl. at 162, paras. 345-46. Instead, they recite "processors," a term which embraces but is not limited to microprocessors. However, this fact does not detract from the merits of the rejection, which requires only that the examiner demonstrate the obviousness of something falling within the scope of the rejected claim.

[41] This term is not addressed in Dr. Koopman's testimony about paragraph 16 of the

Reexamination Control No. 90/005,742
Patent 5,253,341

1    lacking in I/O bandwidth and functionality," id., whereas "a remote host or server machine, like

2    Rozmanith's, would need significant I/O capability," id., is unconvincing because it concerns the

3    obviousness of using a RISC-or CISC-microprocessor server to handle AV data of the type

4    disclosed in the '341 patent rather than to handle information of the type handled by Filepp's file

5    server. The same criticism applies to Dr. Koopman's remaining arguments at pages 4-15,

6    paragraphs 8-33. Dr. Koopman has therefore failed to give us any convincing reason why the

7    trend towards using UNIX servers having RISC or CISC microprocessors would been considered

8    to be inapplicable to Filepp's interactive computer network, including file server 205.

9        For the foregoing reasons, we are affirming the rejection of claims 9, 10, and 14 for

10   obviousness over Filepp in view of "well known practices" as evidenced by The Electronics

11   Engineers' Handbook and the twenty-nine Gale articles.

12        (c) The rejection of claim 11 (two compression techniques[42])

13       Of the five references apparently cited as disclosing the use of two video compression

14   techniques (i.e., De Maine, Carr, Giltner, Notenboom, and LeGall), one (namely, Giltner) is

15   specifically relied on in combination with Filepp in a separate rejection of claim 11, 3d Action at

16   83, para. 18; Final Action at 241, para. 18, and therefore will be addressed in our discussion of

17   that rejection. As for the remaining four references, the examiner's statement of the rejection

18   based on Filepp in view of "well known practices" fails to identify the specific reference

---

Third Office action.

[42] Claim 11 does not include UNIX, RISC, or CISC limitations.

- 41 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    teachings the examiner is proposing to combine with Filepp.[43]  The rejection of claim 11 for

2    obviousness over Filepp in view of "well known practices" as evidenced by De Maine, Carr,

3    Giltner, Notenboom, and LeGall is therefore <u>reversed</u>.

4    **(4) Claims 9, 10, and 14 – obvious over Filepp in view of Row?**

5    The rejection relies on the "Background of the Invention" portion of Row (cols. 1-3)

6    rather than on the detailed description of Row's invention.  Row explains that "[p]resent-day

7    network clients and servers usually run the DOS, MacIntosh OS, OS/2, or Unix operating

8    systems," col. 1, ll. 51-53, and that

9              Unix client nodes typically feature a 16- or 32-bit microprocessor
10    with 1-8 MB of primary memory, a 640x1024 pixel display, and a built-in
11    network interface.  A 40-100 MB local disk is often optional.  Low-end
12    examples are 80286-based PCs or 68000-based MacIntosh I's; mid-range
13    machines include 80386 PCs, MacIntosh II's, and 680X0-based Unix
14    workstations; high-end machines include RISC-based DEC, HP, and Sun
15    Unix workstations.
16

17    <u>Id.</u> at col. 1, l. 62 to col. 2, l. 2.  These characteristics apply to servers as well as to clients:

18    "Servers are typically nothing more than repackaged client nodes, configured in 19-inch racks

19    rather than desk sideboxes." <u>Id.</u> at col. 2, ll. 2-4.  Row further explains that "[d]riven by RISC

20    and CISC microprocessor developments, client workstation performance has increased by more

21    than a factor of ten in the last few years." <u>Id.</u> at col. 2, ll. 7-9.

22    The examiner argues that "[i]t would have been obvious . . . to replace the mainframe

23    used by Filepp et al. with a remote host utilizing a RISC or CISC based processor in view of the

---

[43] The U.S. patent to De Maine has thirty sheets of drawings and 124 columns of text (not including the claims and a printout of a program listing).

Reexamination Control No. 90/005,742
Patent 5,253,341

1     express teaching and motivation supplied by Row et al. (Col. 1, line 33-col. 2, line 22)." 3d

2     Action at 81; Final Action at 239.  Dr. Koopman disagrees, arguing that whereas Filepp discloses

3     a network which includes a mainframe-plus-personal computers (i.e., clients), Row teaches

4     replacing an entire mainframe-plus-dumb terminals network with a workstation-plus-clients

5     network and thus does not suggest "that a mainframe alone can be replaced by a microprocessor-

6     based server in isolation." 2d Koopman Decl. at 169, para. 358.  This argument takes an unduly

7     restrictive view of the disclosures of the two references.  The term "mainframe,"[44] which appears

8     only once in Filepp (at column 82, lines 16-21[45]), refers to the interactive computer network 10,

9     including file server 205.  Thus, Filepp's network can accurately be characterized as either a

10     mainframe-plus-clients network or a server-plus-clients network.  As a result, Row's teaching

11     that present-day clients and servers usually run the DOS, MacIntosh OS, OS/2, or Unix operating

12     systems," col. 1, ll. 51-53, and that high-end machines include RISC-based DEC, HP, and Sun

13     Unix workstations, col. 1, l. 68 to col. 2, l. 2, would have been understood as being applicable to

14     Filepp's file server 205 as well as to the client machines (i.e., RS 400).

15         In another argument for nonobviousness, Dr. Koopman notes that while Row credits

16     UNIX workstations having RISC- or CISC-based microprocessor with an increase in

---

[44]   Que's Dictionary explains at 285 (copy enclosed) that "a mainframe meets the computing needs of an entire organization, and a minicomputer meets the needs of a department within an organization."

[45]   These lines read: "The reception system 400 software is the interface between the user of personal computer 405 and interactive network 10.  The object of reception system software is to minimize mainframe processing, minimize transmission across the network, and support application extendibility and portability."

Reexamination Control No. 90/005,742
Patent 5,253,341

1   performance of greater than a factor of ten (Row, col. 2, ll. 7-9), Row also explains that I/O

2   (input/output) limitations of UNIX servers having RISC- or CISC-based microprocessor have

3   prevented them from keeping up with the increase in workstation demand (col. 2, ll. 9-16).

4   2d Koopman Decl. at 170, para. 359. As a result, according to Dr. Koopman, the servers would

5   not have been understood to be capable of providing the "high quality compression" disclosed in

6   appellant's '341 patent. Id. This argument is unconvincing because it fails to address the

7   rationale of the rejection, which does not require compression of the type of AV data disclosed

8   by appellant, let alone in the manner disclosed by appellant. Instead, the rejection requires that

9   the server be capable only of compressing the type of data disclosed in Filepp and in the manner

10   disclosed by Filepp.

11       For the foregoing reasons, we are _affirming_ the § 103(a) rejection of claim 9 ("said

12   remote host utilizes a RISC based processor and a UNIX based operating system") and claim 10

13   ("said remote host utilizes a CISC based processor and a UNIX based operating system") for

14   obviousness over Filepp in view of Row.

15       Claim 14 differs from claims 9 and 10 by specifying that "said remote server resides on a

16   compatible network in which CISC and RISC based processors operating with a UNIX based

17   operating system communicate in a windowing environment." This language does not require a

18   windowing environment at the _server_; it is broad enough to read on a windowing environment at

19   the client. Regarding the UNIX, RISC, and CISC limitations, Dr. Koopman repeats (2d

20   Koopman Decl. at 170, para. 360) the same unconvincing arguments he made with respect to

21   clams 9 and 10, thereby leaving only the "windowing environment" limitation for our

- 44 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1      consideration. The examiner correctly notes that Filepp teaches a windowing environment in

2      column 8, line 64 to column 9, line 57, which explains that Figures 3a and 3b show the

3      information being displayed in a windowing format at the client machine (RS 400). 3d Action at

4      83, para. 17. Dr. Koopman's criticism that these displays appear at the client machine rather than

5      at the server (2d Koopman Decl. at 171, para. 362) incorrectly construes the claim as requiring a

6      window display at the server.

7          The § 103(a) rejection of claim 14 for obviousness over Filepp in view of Row is

8      affirmed.

9          **(5) Claim 11 – obvious over Filepp in view of Giltner?**

10         Claim 11 differs from claims 9 and 10 by not including UNIX, RISC, or CISC limitations

11      and instead specifying that the compressed response received from the remote server "is

12      compressed utilizing at least two compression techniques."

13         Filepp's compressed response received from the server includes a compression descriptor

14      segment containing the information needed for the decompression of objects compressed in

15      interactive network 10, such as Huffman coding, and more particularly includes parameters to be

16      used by a decompression routine residing at the reception system 400. Filepp, col. 15, ll. 35-41.

17         Giltner discloses a system which compresses data for transmission over a conventional

18      telecommunications network and performs decompression at a remote station. Giltner, col. 1, ll.

19      6-13. As explained in the abstract, on which the examiner relies, the system can be used with

20      text data or other types of data, serial or parallel, such as color television data. The system is

21      useful when the number of possible data units (e.g., words in the English language) is very large.

1   Id. at col. 1, l. 67 to col. 2, l. 5. The first type of encoding employed by the system is to replace

2   at least some data units with library addresses:

3       [T]he most statistically recurrent portion of the total number of units are
4       stored in a memory library. Then the memory library is searched for each
5       word/unit and if the word/unit is found, the binary address of the word/unit
6       in the library memory is substituted for the binary data representing the
7       word/unit together with an appropriate code indicating that the substitution
8       has been made. The binary data stream is thus compressed by compiling a
9       data stream consisting alternatively of units in the original form, or the
10      addresses of such units in a library memory, with an "escape code"
11      designating which alternative is used. Decompression is then achieved by
12      detecting the address data and fetching the unit from the same address of
13      an identical library memory.

14

15   Id. at col. 2, ll. 43-57. This first encoding technique can be supplemented by applying Huffman

16   coding to the data units which are not found in the library memory. Id. at col. 3, ll. 28-32.[46] The

17   library memory can be predetermined and fixed or can be complied in a reconfiguration library as

18   data are being transmitted. Id. at col. 3, ll. 40-43.

19       The examiner's position is that it would have been obvious to modify the compression

20   teaching of Filepp with that of Giltner "[f]or the benefit[s] expressly taught by Giltner et al.

21   (Col. 13, line 65 - col.14, line 67)." 3d Action at 85-86, para. 18; Final Action at 242-43,

22   para. 18. Some of these benefits are stated as follows:

23       Since the unit 14 can operate at a substantially greater speed than
24      data can be transmitted over most communications networks, a number of
25      options are available in the sequence of operation. For example, as soon
26      as a portion of a message is received from the local station and stored in
27      memory, the unit will attempt to establish contact with the designated
28      remote terminal. Compression of the message can then begin as soon as a

---

[46] Dr. Koopman's testimony (2d Koopman Decl. at 80, para. 169) that Giltner fails to disclose two compression modes is therefore not understood.

Reexamination Control No. 90/005,742
Patent 5,253,341

1        suitable answerback is received. The message can then be simultaneously
2        received from a local terminal, compressed, and transmitted to the remote
3        terminal. This permits the use of smaller buffers 42 and 44 to handle
4        messages of indefinite length. A similar approach can be used for
5        receiving messages from remote terminals, decompressing the messages,
6        and forwarding them to the local terminal.
7               From the above detailed description of a preferred embodiment of
8        the invention, it will be appreciated by those skilled in the art that a unique
9        and novel text compression system has been described. The text
10       compression system may be advantageously used as an in-line addition for
11       existing relatively slow speed data handling systems, particularly
12       telecommunications systems. While the text compression system is
13       particularly useful for English and other language text, it also has
14       application in its broader aspects of compression to other data compiled in
15       a similar format.
16
17   Giltner, col. 13, l. 66 to col. 14, l. 24.

18        Dr. Koopman, after correctly characterizing Giltner as disclosing "a hybrid compression

19   scheme that uses two related but slightly different mechanisms intermingled in a stream of

20   compressed data," 2d Koopman Decl. at 84, para. 177, denies that this is sufficient to satisfy the

21   claim:

22        The examiner repeatedly argues that any compressed data stream with
23        more than one possible sub-algorithm comprises "two compression
24        techniques." But, those are mere combinations of mechanisms, in contrast
25        to the word "techniques," which implies that the techniques are being
26        distinctly applied. The difference is clear and compelling, as well as fully
27        supported by the claim wording.
28
29   Id. Dr. Koopman appears to be construing the claim language as requiring the simultaneous

30   application of plural encoding techniques to the same data units. We agree with the examiner

31   that the claim language is broad enough to read on successively applying different techniques to

32   different data units, as in Giltner.

Reexamination Control No. 90/005,742
Patent 5,253,341

1       Dr. Koopman also criticizes the rejection on other grounds, none of which is persuasive.

2  His complaint that the examiner failed to identify which benefit he is relying on in the nearly full

3  column of cited text, 2d Koopman Decl. at 172, para. 364, is unconvincing. Dr. Koopman

4  should have assumed that the examiner is relying on each of the several benefits discussed in

5  those lines. Dr. Koopman's assertion that Giltner's compression technique "is grossly ineffective

6  to use on the vast majority of AV data, including without limitation digital color images,

7  monochrome color images, and audio data," Id. at 79, para. 168, ignores the fact that the rationale

8  of the rejection does not require compressing and decompressing such data. Instead, the

9  examiner has argued the obviousness of using Giltner's plural compression techniques (i.e.,

10  dictionary addressing and Huffman encoding) to compress the object and message data that

11  Filepp compresses using only one those techniques (i.e., Huffman coding). Dr. Koopman's

12  discussion of the differences between Giltner's color digital video and color television pictures

13  likewise has no relevance to the rejection. 2d Koopman Decl. at 79-80, para. 170.

14       We hold that it would have been obvious to modify Filepp so as to employ the two

15  compression techniques disclosed in Giltner in order to reduce the amount of data to be

16  transmitted and thus are affirming the rejection of claim 11 on this ground.

17  **N. Rejections of claim 11 based on Yurt**

18       **(1) The effect of the Rule 131 declarations**
19
20       The Rule 131 declarations by inventor Anthony Rozmanith and by noninventor Egon

21  Fabian (a software consultant and programmer) assert conception of the claimed subject matter

22

- 48 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    prior to Yurt's January 7, 1991, effective date under 35 U.S.C. § 102(e)(2) coupled with

2    reasonable diligence from prior to that date up to appellant's April 11, 1991, filing date.

3           A showing of prior invention must address every limitation of the rejected claim or

4    claims:

5                  (a) When any claim of an application or a patent under
6           reexamination is rejected, the inventor of the subject matter of the rejected
7           claim, the owner of the patent under reexamination, or the party qualified
8           under §§ 1.42, 1.43, or 1.47, may submit an appropriate oath or declaration
9           to establish invention of the subject matter of the rejected claim prior to
10          the effective date of the reference or activity on which the rejection is
11          based.
12
13   37 CFR § 1.131(a) (2006).  As noted by the examiner, Final Action at 202, para. 367, these

14   declarations were filed in order to overcome the previous (now withdrawn) rejections of claims

15   93, 95, 96, 99, 100, and 102-04 based on Yurt, not the rejections of claim 11, the sole claim now

16   rejected over that reference.  As a result, these declarations make no attempt to explain how the

17   facts recited therein demonstrate either (a) prior conception of the subject matter of claim 11,

18   including its recitation of using two compression techniques to compress the response to the

19   query (not recited in any of claims 93, 95, 96, 99, 100, and 102-04), or (b) the exercise of

20   reasonable diligence in reducing that claimed subject matter to practice.  Nor does the brief offer

21   such an explanation.  See In re Borkowski, 505 F.2d 713, 718, 184 USPQ 29, 33 (CCPA 1974)

22   (Rule 131 showing held deficient because "[t]he original and supplemental affidavits together

23   with the accompanying comments do not adequately explain what facts or data appellant is

24   relying upon to show a completion of the invention prior to April 13, 1961.").

25

- 49 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1   The examiner was therefore correct to hold that the declarations are insufficient to

2   antedate Yurt as a reference with respect to the rejections of claim 11.

3   **(2) The Yurt disclosure**

4   Figures 1a to 1g of Yurt are block diagrams of various configurations of transmission

5   systems 100 and reception systems 200 (Yurt, col. 3, ll. 24-26) which permit remote users to

6   request audio and/or video information from a compressed data library 118 (Fig. 2b) in the

7   transmission system (Id. at col. 6, ll. 35-38). In the Figure 1e configuration, transmission system

8   100 is directly connected to (a) a reception system 200 that includes a single user and (b) a

9   reception system 200' that serves as the head end of cable television systems 200a and 200b. Id.

10  at col. 4, ll. 22-29. As shown in Figure 2b, transmission system 100 may send the requested

11  information to the customer's reception system 200 (or 200') using any of the following

12  communication links: ISDN (Integrated Services Digital Network), B ISDN (Broadband

13  Integrated Services Digital Network), satellite, cable TV, LAN or MAN, or telephone lines. Id.

14  at col. 16, ll. 4-15. The transceiver 122 which sends the requested information over standard

15  telephone lines is a modem. Id. at col. 16, ll. 58-59. The user accesses the transmission system

16  100 (i.e., sends a request for information) over a standard telephone line. Id. at col. 3, ll. 54-58;

17  col. 14, ll. 6-9. Video data are compressed using two compression techniques:

18      Video data compression preferably involves applying two processes: a
19      discrete cosine transform, and motion compensation. This process is
20      described in "A Chip Set Core of Image Compression", by Artieri and
21      Colavin. Multiple frames of video data may preferably be analyzed for
22      patterns in the horizontal (H), vertical (V), diagonal (zigzag) and time (Z)
23      axis. By finding repetition in the video data, redundancy may be removed
24      and the video data may be compressed with a minimal loss of information.

- 50 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1   Id. at col. 10, ll. 3-17. Referring to Figure 6, which depicts a preferred embodiment of a

2   receiving system 200 (col. 17, ll. 67-68), transceiver 201 automatically receives the information

3   from the transmitter 122 as compressed formatted data blocks, while format converter 202

4   converts the compressed formatted data blocks into a format suitable for storage in storage

5   device 203. Id. at col. 18, ll. 6-21. When playback is requested, the compressed formatted data

6   blocks are sent to a data formatter 204, which processes the compressed formatted data blocks

7   and separates audio and video information. Id. at col. 18, ll. 26. During playback, the separated

8   audio and video information are respectively decompressed by audio decompressor 209 and

9   video decompressor 208 before being applied to digital and analog audio and video output

10  terminals 211-14. Id. at col. 18, ll.27-38.

11      **(3) Comparing claim 11 to Yurt**
12
13      The examiner contends, and Dr. Koopman does not deny, that Yurt discloses all of the

14  claimed subject matter except for the requirement that the query be transmitted from the remote

15  query and data retrieval means to the remote host processor "via a concentrator means." 3d

16  Action at 86, para. 19; Final Action at 243, para. 19. Specifically, he reads the recited end user

17  means and remote query and date retrieval means on the reception system 200 depicted in

18  Figure 6, the recited remote host on the transmission system 100 depicted in Figures 2a and 2b,

19  and the recited input/output means on element 207 in Figure 6. Decompression of the video

20  information, which has been compressed in the transmission system using two compression

21  techniques, is effected by decompression element 208 in Figure 6, which outputs digital and

- 51 -

1   analog video signals on terminals 211 and 213. The decompressed video information can be

2   immediately reproduced on a display system, such as a television display. Id. at col. 18, ll. 36-37.

3       The '341 patent does not define or restrict the term "concentrator," which is described

4   therein in part as follows:

5       Where a cluster of EUS's 10 cannot economically justify a single
6       dedicated server, a neighboring server in the Global Server Network 29
7       may be loaded with services for the said cluster of EUS's. In this case,
8       communication between an individual EUS 10 and the Server is
9       accommodated through a concentrator 19 which stores and forwards EUS
10      requests and corresponding server replies, thereby allowing for more
11      efficient utilization of the DDS communication channel.

12
13  '341 patent, col. 3, ll. 43-51.

14      **(4) Claim 11 – obvious over Yurt in view of Kandell?**

15      The examiner cites column 2, line 54 to column 3, line 5 of the "Background of the

16  Invention" portion of Kandell's specification as evidence that it would have been obvious to add

17  Kandell's disclosed concentrator to Yurt in order "to allow for sharing of high speed access

18  among multiple users." 3d Action at 86-87, para. 19; Final Action at 243, para. 19. The cited

19  text reads:

20      Concentrators enable an efficient utilization of data channels in
21      digital data networks. Basically, a digital data network includes
22      modulator/demodulator ("modem") circuits for enabling digital
23      information to be transferred over a normal telephone network in an
24      analog form. When several subscribers in one area require only low-speed
25      data transfers, each subscriber is connected to a local concentrator at a
26      particular location by means of two low-speed modems; one at subscriber's
27      location and the other at the concentrator location. The concentrator
28      location will have one such low-speed modem for each incoming
29      telephone line. A digital processing circuit converts the digital signals
30      between the low-speed modems of the concentrator and a time

- 52 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1   multiplexed, high-speed, serial, digital pulse train that is applied to and
2   received from a high-speed modem that is in a high-speed path to a data
3   processing center. Oftentimes these concentrators are very sophisticated
4   and an apparently large concentration can occur at such a point.
5
6   Kandell, col. 2, l. 54 to col. 3, l. 5. We understand the examiner's position to be that it would

7   have been obvious in view of the above teaching to replace (a) the transceiver (i.e., low-speed

8   modem) 122 in Yurt's Figure 2b transmission system that is connected via a plurality of standard,

9   low-speed telephone lines to respective reception systems 200 with (b) a high-speed modem

10  connected via a high-speed communication line to a high-speed modem in a remotely located

11  concentrator that communicates with the reception systems via low-speed modems and low-

12  speed telephone lines.

13      Dr. Koopman argues (2d Koopman Decl. at 173, para. 368) that the succeeding paragraph

14  in Kandell, quoted below, teaches way from using a concentrator in a conventional voice

15  telephony system:

16          However, in many applications the actual concentration is less than
17      40:1. Moreover, this approach is not readily adapted for application to
18      conventional, voice telephony. The high speed data networ[k]s require
19      specially conditioned telephone lines that are expensive to utilize, and the
20      required modems are expensive. The modems produce or respond to
21      carriers held to a finite fr[e]quency band and digital processing circuits are,
22      in effect, independent switches that can become quite complex and
23      expensive. In addition, even if readily adapted to a telephony network, the
24      economic benefit of substituting this type of a concentrator network at a
25      remote location in a telephony system would not be economically justified
26      by the cabling savings that would otherwise be provided.
27
28  Kandell, col. 3, ll. 6-20. The examiner responded to this criticism by asserting that "Kandell's

29  teaching is [that] in [a] remote area it is not economically viable, not [that] in general [it is not

Reexamination Control No. 90/005,742
Patent 5,253,341

1   viable]," Final Action at 202-03, para. 368; Answer at 201, para. 368, a reasonable interpretation

2   that is not addressed by Dr. Koopman or appellant. Moreover, Kandell does not actually "teach

3   away" in the patent law sense from using the disclosed concentrators in a standard voice

4   telephony system. The reason is that instead of questioning the technological feasibility of such

5   an arrangement, Kandell finds faults for merely economic reasons. See Syntex (U.S.A.) LLC v.

6   Apotex, Inc., 407 F.3d 1371, 1380, 74 USPQ2d 1823, 1830 (Fed. Cir. 2005):

7                 Under the proper legal standard, a reference will teach away when
8      it suggests that the developments flowing from its disclosures are unlikely
9      to produce the objective of the applicant's invention. In re Gurley, 27 F.3d
10    551, 553 [31 USPQ2d 1130, 1131] (Fed. Cir. 1994). A statement that a
11    particular combination is not a preferred embodiment does not teach away
12    absent clear discouragement of that combination. In re Fulton, 391 F.3d
13    1195, 1199-1200 [73 USPQ2d 1141, 1146] (Fed. Cir. 2004)].
14

15   The rejection of claim 11 for obviousness over Yurt in view of Kandell is therefore

16   affirmed.

17   **(5) Claim 11 – obvious over Yurt in view of Gargini?**

18   Gargini discloses television cable systems in which subscribers can receive signals from

19   as well as return signals to the system via a cable carrying electrical or optical signals. Id. at

20   col. 1, ll. 5-8. The cable system depicted in Figure 7 includes concentrators 76, whose inputs are

21   connected to head end 71 by trunk lines 75 and whose outputs are connected to switching centers

22   78 by subtrunk lines 77. Id. at col. 8, l. 64 to col. 9, l. 1. Each concentrator 76 is connected to its

23   associated switching centers by seven coaxial cables, six of which carry the groups of VHF

24   television signals and the seventh of which carries Band II signals and control data signals. Id. at

25   col. 9, ll. 36-40. As shown in Figure 7, each switching center is connected to a plurality of

Reexamination Control No. 90/005,742
Patent 5,253,341

1    homes 80, each of which includes a plurality of outlets or subscriber stations 81. Each subscriber

2    station includes a keypad for sending data to the head end. Id. at col. 10, ll. 4-8. These data

3    identify the desired television program. Id. at col. 9, ll. 1

4          The examiner contends that "[i]t would have been obvious . . . to modify Yurt et al. with

5    Gargini et al. to allow for sharing of high speed access among multiple users and other the [sic]

6    benefits expressly recited (col. 11, lines 9-17; col. 11, lines 44-55)." 3d Action at 87-88, para.

7    20; Final Action at 244, para. 20 . The cited lines explain that the concentrators (a) perform some

8    data processing in order to reduce the work load of the CPU at the head-end and reduce the

9    amount of data to be transmitted from the concentrators to the head end (col. 11, ll. 9-17) and

10    (b) reassemble the data for high speed transmission to the CPU at the head end. Id. at col. 11, ll.

11    44-55.

12          We agree with the examiner that it would have been obvious in order to obtain the afore-

13    mentioned benefits to implement the Yurt's cable television reception systems (e.g., 200a and

14    200b in Figs. 1e and 1f) as cable distribution systems of the type depicted in Figure 7 of Gargini,

15    including the concentrators, which relay a request for a specific television program (the recited

16    "query") from the subscriber to the central station. Dr. Koopman's argument that column 3, lines

17    6-20 of Kandell (discussed supra) teach away from this proposed combination of Yurt and

18    Gargini (2d Koopman Decl. at 175, para. 373) is unconvincing because that passage in Kandell

19    discusses the use of concentrators with standard telephone lines rather than with coaxial cables

20    and also because that "teaching away" argument is unpersuasive even with respect to standard

21    telephone lines.

- 55 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    The rejection of claim 11 over Yurt in view of Gargini is therefore **affirmed**.

2    **O. The scope and meaning of claims 93-99**

3    Claim 93, on which claims 94-99 depend directly or indirectly, reads:

4    93. A method for downloading responsive data from a remote
5    server comprising the following steps:
6    (a) identifying a query via a data input means and inputting said
7    query to remote query and data retrieval means;
8    (b) transmitting said query from said remote query and data
9    retrieval means to a remote server via an input/output means;
10   (c) receiving a compressed or non-compressed response to said
11   query at said remote query and data retrieval means from said remote
12   server via said input/output means;
13   (d) displaying a presentation corresponding to said compressed or
14   non-compressed response on output means;
15   (e) wherein said displaying step commences before said step of
16   receiving said compressed or non-compressed response has been
17   completed.

18
19   Step (e) precludes downloading and storing the entire response at the user location (which

20   contains the recited input/output means and remote query and data retrieval means) prior to

21   commencing display of the corresponding presentation.

22   **P. The merits of the § 112 rejection of claims 94 and 97**

23   Dependent claims 94 and 97 stand rejected under § 112, first paragraph, as based on a

24   non-enabling disclosure. These claims specify (1) that the response represents an image (claim

25   94) or an animation sequence (recited in claim 96, on which claim 97 depends) and (2) that the

26   server generates the response by using differential compression "following receipt of said query"

27   from the user location (claims 94 and 97).[47]

---

[47] More particularly, claim 94 specifies that "said compressed or non-compressed

Reexamination Control No. 90/005,742
Patent 5,253,341

1      The§ 112 rejection is based on testimony by Dr. Koopman concerning a Bridges article

2      that is cited in the '341 patent for its disclosure of differential compression and is also relied on

3      by the examiner in a § 103(a) rejection of claims 94 and 97 (i.e., for obviousness over Cohen in

4      view of Bridges and Punj).  2d Action at 21, para. 43; 3d Action at 92, para. 28; Final Action at

5      248, para. 28. The pertinent part of the '341 patent reads:

6              Furthermore, in order to accommodate efficient compression and
7              decompression of animated sequences (as in feature film video), a
8              technique of Differential (DFF) Image Compression (DIC), as described in
9              an article by John Bridges in Dr. Dobb's Journal #173 February 1991, page
10             38, et seq may utilized as part of the decompression module.
11
12     '341 patent, col. 7, ll. 34-40.[48] The '341 patent explains that Bridge's differential compression

13     techniques can be used for communications over a high band-width channel (e.g., CATV), col. 7,

14     l. 53 to col. 8, l. 12, or over a standard DDS telephone line. Id. at col. 8, ll. 13-23.

15     Cohen (described in more detail below in the discussion of the rejection) discloses a

16     system which employs telephone lines or a fiber optic cable network to send movies from a

17     central location to a subscriber site. Cohen, col. 4, ll. 41-46; claims 2 and 3. The § 103(a)

18     rejection characterizes Bridges as "disclos[ing] a system for compressing upon transmission to

19     allow for realtime display of the transmitted video." 2d Action at 22, para. 46; 3d Action at 93,

20     para. 31; Final Action at 248, para. 31.  In his first declaration, Dr. Koopman disagreed with the

21

---

response comprises an image that is differentially compressed following receipt of said query."
Claim 97 specifies that "said animation sequence [recited in claim 96] is differentially
compressed following receipt of said query."

[48]     The page numbers of the copy of Bridges that is of record run from 1 to 13.

- 57 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1   examiner's characterization of Bridges for the following reasons, which the examiner now cites

2   as the basis for the § 112 non-enablement rejection:

3           56.  Bridges does the opposite of what the examiner states.
4   Bridges teaches that using differential compression for real-time
5   compression of query responses is impractical when attempting to
6   compress while transmitting.  Specifically Bridges page 13 [i.e., the last
7   page] states:
8
9           "If you are willing to sacrifice image quality for fast motion, you
10          can still have crystal clear images – if you can sit still long enough.
11          . . .
12          Note, the key phrase here is 'sit still,' which shows we have a long
13          way to go until video phones are as common as FAX machines.
14
15  Thus Bridges is saying that differential compression is so hopelessly slow
16  that it would be unrealistic to use it for a system such as that taught by
17  Rozmanith.  Thus, Bridges teaches away from Rozmanith.  In addition,
18  videophone-quality compression is unsatisfactory for query/response data
19  such as AV data used for marketing purposes because of its generally low
20  visual quality.
21
22  1st Koopman Decl. at 29, para. 56.  In his second declaration, Dr. Koopman explains he was not

23  arguing that Bridges is non-enabling but rather that Bridges teaches away from appellant's

24  disclosure of using Bridges's DFF compression technique to compress AV data.  2d Koopman

25  Decl. at 138-39, para. 296.  The examiner refused to give weight to this testimony on the ground

26  that it contradicts Dr. Koopman's earlier testimony and he has not satisfactorily explained the

27  change in his testimony.  Final Action at 173, para. 296; Answer at 180, para. 296 (adding

28  citation of In re Ruff, 256 F.2d 590, 118 USPQ 340 (CCPA 1958)).

29          We are reversing the § 112 rejection, because we do not consider Dr. Koopman's initial

30  testimony to be an admission of non-enablement.  In the first place, the passages Dr. Koopman

- 58 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    quoted from Bridges do not apply to communications over a fiber-optic cable network, one of the

2    transmission media disclosed in the '341 patent (element 26 in Fig. 1) and encompassed by the

3    rejected claims, which do not specify any particular type of transmission medium. Nor does

4    Bridges teach away from using his DFF compression technique to send video (claim 94) or an

5    animation sequence (claim 97) over a telephone line. Instead, the cited passages simply

6    recognize that the low bandwidth of telephones lines restricts the quality of the transmitted

7    information. Finally, Dr. Koopman's assertion that Bridges's videophone-quality compression is

8    unsatisfactory for AV data used for marketing purposes is irrelevant, because such AV data is not

9    recited in claim 94 or claim 97.

10          The § 112 rejection of claims 94 and 97 is therefore reversed.

11   **Q. The rejections based on Walter**

12
13        **(1) Claims 93, 95, 96, and 98-101 – anticipated by Walter?**

14
15          Walter discloses a programming-on-demand cable system 10 having a central station 12

16   and a data receiving station 14 and employing optical fibers as the transmission media for the

17   selected programs. Each of the memory modules 24, 26, 28, 30, 32, and 34 at the central station

18   stores a video program. Walter, col. 4, ll. 7-11. The program is stored in these modules in

19   compressed form for subsequent transmission to the data receiving station in compressed form.

20   Id. at col. 7, ll. 17-19. At the data receiving station, the user uses the keyboard 18, control

21   computer 112, and automatic modem 134 to send an "address" identifying the desired video

22   program over telephone lines 138 and 142 to the modem 143 and host computer 20 in the central

23   station. Id. at col. 7, ll. 48-57. The host computer acknowledges the request by sending a

- 59 -