Reexamination Control No. 90/005,742
Patent 5,253,341

1  "receipt" signal over the telephone lines to the data receiving station, which displays that

2  acknowledgment to the user on television 146. Id. at col. 7, ll. 57-63. The requested program is

3  then sent over the fiber optic lines to the data receiving station, where it is converted to electrical

4  signals by photodiode modules 86, 88, 90, 92, and 130 and stored in memory module 102, at

5  which time the host computer 20 informs the user that the program is ready for viewing by

6  causing the display of a "ready" signal on the television. Id. at col. 8, ll. 12-19. Alternatively,

7  viewing can begin prior to completion of transmission:

8      Although the above description was made in terms of a fully
9      completed transmission of a program before viewing by the user, the
10     present invention fully contemplates that the user may begin viewing his
11     program before the complete transmission thereof. Central data station 12
12     may transmit only a portion of the selected program to the user for his
13     viewing, and then begin transmitting a portion of another selected program
14     to a second user. This permits central data station 12 to simultaneously
15     handle several users, rather than waiting for complete transmission of one
16     selected program before proceeding with another user's address signal.
17
18  Id. at col. 8, ll. 36-47. The user begins the video program by depressing a "START" switch on

19  keyboard 18. Id. at col. 8, ll. 19-20.

20     The examiner correctly asserts that all of the limitations of claim 93 read on Walter.

21  3d Action at 94, para. 34; Final Action at 249, para. 34. Dr. Koopman's argument that Walter

22  fails to disclose the use of compressed and non-compressed responses, 2d Koopman Decl. at 182,

23  para. 392, is apparently based on the misconception that Walter, to be anticipatory of the claim,

24  must disclose both types of responses. However, reception of either type of response is enough

25  to satisfy the claim, as noted by the examiner. Answer at 202-03, para. 392. Dr. Koopman also

26  argues that Walter fails to disclose using the same input/output means for transmitting the query

Reexamination Control No. 90/005,742
Patent 5,253,341

1   to the server and for receiving the response from the server, noting that Walter's query is

2   transmitted to the central station via modem 134 and telephone lines 138 and 142, whereas the

3   video program data is received from the central station via the optical fibers and the photodiode

4   modules. 2d Koopman Decl. at 183, para. 393. However, the claim language does not preclude

5   the recited "input/output means" from collectively reading on modem 134 and the photodiode

6   modules in the data receiving station.

7        Regarding step (e) ("wherein said displaying step commences before said step of

8   receiving said compressed or non-compressed response has been completed"), Dr. Koopman

9   contends that the discussion of that feature at column 8, lines 36-47, of Walter, reproduced

10   above, is non-enabling:

11        A practitioner of ordinary skill in the art would not have enough
12        information to proceed from this description. Significant issues that would
13        have to be addressed include how to package data for interleaved
14        transmission, how long each "portion" should be, how receiving stations
15        would be able to receive and reassemble portions, and so on. All of these
16        issues are dealt with in sufficient detail within Rozmanith's ['341] patent to
17        be enabling (e.g., Rozmanith Fig. 5 and col. 98 line 52 – col. 10 line 52).
18        But Walter provides only a single sentence that provides insufficient
19        information to be enabling on this topic.
20

21   2d Koopman Decl. at 183-84, para. 394. We are not persuaded that Dr. Koopman's testimony

22   demonstrates non-enablement. While his identification of issues left to be revolved appears to be

23   correct, he has not adequately explained why their resolution would have required undue

24   experimentation.

25        The rejection of claim 93 for anticipation by Walter is therefore <u>affirmed</u>.

26        Claim 95, which depends on claim 93 and further specifies that "said . . . response

Reexamination Control No. 90/005,742
Patent 5,253,341

1  comprises an image that has been differentially compressed prior to receipt of said query," is also

2  satisfied by the Walter system, which uses inter-frame differential pulse code modulation to

3  encode the video program data for storage and later transmission. Walter, col. 7, ll. 26-30.[49]

4  Dependent claim 96, which specifies that the response comprises an animation sequence, reads

5  on Walter's video programs, as does claim 98, which depends on claim 96 and specifies that the

6  animation sequence is compressed prior to receipt of the query. Dr. Koopman does not deny that

7  the limitations added by claims 95, 96, and 98 read on Walter. The rejection of these claims for

8  anticipation by Walter is affirmed.

9      Dependent claim 99 specifies that the compressed or non-compressed response comprises

10  audio data in digital format and that the displaying step comprises audible playback of the audio

11  data. The examiner reads claim 99 on the passage at column 2, lines 19-46 of Walter (3d Action

12  at 95, para. 34), which passage Dr. Koopman correctly points out makes no mention of "audio."

13  2d Koopman Decl. at 184, para. 395. He also correctly notes that the Walter patent nowhere

14  mentions "audio" or "sound." Id. However, the examiner responds, correctly in our view, that a

15  person skilled in the art would have understood that Walter's video programs, such as the two-

16  hour movie mentioned at column 7, lines 44-47, inherently (i.e., necessarily) contain audio that is

17  audibly reproduced by television 146. Final Action at 214, para. 395; Answer at 204, para. 395.

18  The rejection of claim 99 for anticipation by Walter is therefore affirmed.

19

---

[49] The claim is broad enough to read on intra-frame or inter-frame differential compression.

- 62 -

1      Claim 100, an independent claim that repeats the preamble and steps (a) to (d) of claim

2    93 and recites as step (e) "wherein said compressed or non-compressed response comprises an

3    image," reads on Walter's stored and transmitted video programs. The rejection is therefore

4    <u>affirmed</u> as to that claim.

5      Claim 101 also repeats the preamble and paragraphs (a) to (d) of claim 93 and recites as

6    step (e):

7        (e)  wherein said compressed or non-compressed response is
8    compressed prior to receipt at said remote query and data retrieval means,
9    and wherein said compressed response is decompressed at said remote
10   query and data retrieval means using an asymmetric decompression
11   technique corresponding to an inverse operation of the technique used to
12   compress said compressed or non-compressed response.
13
14   The first "wherein" clause is satisfied because each video program is transmitted in compressed

15   form and thus is compressed prior to receipt of the response by the data receiving station, which

16   corresponds to the recited "remote query and data retrieval means."

17      As for the second "wherein" clause, the examiner and appellant do not agree on the

18   meaning of "asymmetric decompression." The examiner construes the following language in the

19   abstract of the '341 patent as an admission that compression and inverse decompression

20   techniques are inherently asymmetric:

21      The EUS may transmit a query to the Server manually and/or
22   automatically for the purpose of initiating a process in the Server (e.g. data
23   compression, indexing into a very large database, etc.), which requires the
24   high speed processing, large capacity and multi-distributed data storage,
25   etc.) which are typically preferred at a Server. The EUS provides
26   appropriate inverse processing (e.g. data decompression) which, by its
27   nature, requires relatively little processing power to accomplish. Thus, the

Reexamination Control No. 90/005,742
Patent 5,253,341

1      method of this invention exploits the inherent asymmetry in the overall
2      process of an EUS querying a remote Server (and/or Server Network) for a
3      data service (e.g. retrieval of AV data in faster than real time) where most
4      of the processing power and global scheduling is performed by the Server.
5
6   '341 patent, abstract.[50]  Specifically, the examiner contends that
7
8      the use of [a] asymmetric decompression technique corresponding to an
9      inverse operation of the technique used to compress is inherent [in
10     Walter[, as] evidenced by . . . patentee's statement in the abstract of the
11     instant patent[:] "The UES provides appropriate inverse processing (e.g.
12     data compression) which by its nature, requires relatively little processing
13     power to accomplish.  Thus, the method of the invention exploits the
14     inherent asymmetry of the overall process . . . ."
15
16  3d Action at 95-96; Final Action at 250-51.  Dr. Koopman denies that all compression and

17  inverse decompression techniques are inherently asymmetric. 2d Koopman Decl. at 184,

18  para. 397 (citing paragraphs 249-51 and 337-40 of that declaration, which specifically address the

19  now-withdrawn § 112, first paragraph, rejection of claim 101 for lack of written description

20  support).  In that cited testimony, Dr. Koopman explains that only some compression and inverse

21  decompression techniques are asymmetric:

22     [S]ome compression/decompression systems have the property that
23     compression takes markedly more computational power than
24     decompression ("markedly" typically means by integer multipliers of time
25     for a given CPU speed); these are asymmetric systems.  A typical instance
26     of an asymmetric technique is one for continuous-tone imagery such as
27     JPEG.  Some compression/decompression systems have the property that
28     compression takes the same amount of time as decompression; these are
29     symmetric systems.  An example of a symmetric technique is one for
30     monochrome graphical data such as CCITT compression or run-length
31     encoding.  As mentioned previously, both JPEG and CCITT are taught by
32     [the '341 patent].
33

---

[50]  Similar language appears at column 2, lines 35-44.

Reexamination Control No. 90/005,742
Patent 5,253,341

1   2d Koopman Decl. at 119-20, para. 250.[51] In support, Dr. Koopman (2d Koopman Decl. at 120,

2   para. 251) cited a definition that reads in part: **"asymmetric compression:** A data compression

3   technique that requires more processing capability to compress than to decompress." <u>Telecom</u>

4   <u>Glossary 2K</u>, http://www.atis.org/tg2k/_asymmetric_compression.html (accessed July 6, 2002).

5   Although the 2002 date of this definition is subsequent to appellant's April 1991 filing date, we

6   of the opinion that both it and Dr. Koopman's testimony are consistent with the discussion of

7   compression and decompression in the '341 patent disclosure. What the examiner apparently has

8   failed to recognize is that the system disclosed in the '341 patent is "asymmetric" in two different

9   respects. The first respect, the only one to which the '341 patent applies the term "asymmetric,"

10   concerns the different processing powers of the server and the end user station, a relationship

11   which exists whether or not the responses are in compressed form. Specifically, after explaining

12   that "[i]n operation, the EUS transmits a query to the server for the purpose of initiating a process

13   in the server (e.g. data compression, indexing into a very large database, etc.), via an optional

14   concentrator or requiring the high speed processing, large capacity and multi-distributed data

15   storage, etc. typically included in the server," '341 patent, col. 2, ll. 29-35, the patent

16   characterizes this difference in processing power as "an inherent asymmetry in the overall

17   process in which an EUS queries a remote server (and/or Server Network) for a data service (e.g.

18   retrieval of audio visual data in faster than real time) where most of the processing power resides

---

[51] The examiner did not address the merits of this testimony. Instead, he responded to the testimony in paragraphs 249-51 and 337-40 about the meaning of "asymmetric" simply by noting that "the rejections" (presumably the § 112 rejections) have been withdrawn. Answer at 162 and 188.

1   in the Server." Id. at col. 2, ll. 39-44. The second respect in which the disclosed system is

2   asymmetric is to employ compression and inverse decompression techniques which have

3   asymmetric processing power requirements and thus take advantage of the asymmetrical

4   processing power of the server and EUS:

5         The EUS provides appropriate inverse processing (e.g. data
6         decompression) which, by its nature, requires relatively little processing
7         power to accomplish. Thus, the method of this invention exploits an
8         inherent asymmetry in the overall process . . . where most of the
9         processing power and global scheduling is performed by the Server.
10
11   Id.; abstract. Thus, the first of these two quoted sentences refers to the compression and inverse

12   decompression techniques selected for use in the EUS rather than to all compression and inverse

13   decompression techniques.

14         For the foregoing reasons, we agree with Dr. Koopman that the term "asymmetric" in

15   claim 101 means that the inverse decompression technique requires less processing power that

16   does the compression technique. The examiner does not contend that all inter-frame differential-

17   pulse-code-modulation compression techniques and inverse decompression techniques are

18   necessarily asymmetric. Instead, he argues that "as the data receiving station (12 [sic, 14]) in

19   Walter would not be expected to have the processing power of the host computer (20), the use of

20   asymmetric compression is inherent for real-time display of video." Answer at 204-05, para.

21   397. While we agree that Walter's data receiving station would not be expected to have the

22   processing power of host computer 20, the examiner has not explained, and it is not apparent to

23   us, why it necessarily follows that the use of asymmetric compression is inherent for real-time

24   display of video. The examiner has not explained and it is not otherwise apparent, why Walter's

Reexamination Control No. 90/005,742
Patent 5,253,341

1   system cannot achieve real-time display using symmetrical inter-frame differential-pulse-code-

2   modulation techniques to effect compression and inverse decompression. Accordingly, we are

3   <u>reversing</u> the rejection of claim 101 for anticipation by Walter.

4        **(2) Claim 103 – obvious over Walter in view of Kirchner?**

5        Claim 103 repeats the preamble and paragraphs (a) to (d) of claim 93 and recites as

6   step (e): "wherein said remote query and data retrieval means is mobile."

7        The term "mobile" is not defined in the '341 patent and appears therein in only the

8   following sentence: "It is yet a further object of the present invention to provide a remote query

9   communication system in which the end user station is mobile." '341 patent, col. 1, ll. 59-61.

10   Neither the examiner nor the appellant has provided a definition of "mobile" as used in the claim.

11   Broadly defined, "mobile" simply means "[c]apable of moving or being moved from place to

12   place." <u>The American Heritage Dictionary of the English Language</u> 842 (New College Edition,

13   1975). However, in the context of the needs allegedly solved by the invention, it is reasonable to

14   interpret "mobile" as used in the claim more narrowly as requiring that the "remote query and

15   data retrieval means" (with or without the remaining components of the disclosed end user

16   station) be capable of convenient transportation from one location to another, such as from the

17   office to a hotel:

18          There has long been a need to provide a system, method and device
19     which can rapidly enter, communicate, distribute and/or retrieve data and
20     display the data in a timely fashion for a variety of applications. Such a
21     system and method could be utilized to immediately access and rapidly
22     display information relevant to new consumer products, financial
23     information, real estate listings, travel accommodations and special events
24     or performances and the like at an end user station as well as provide

Reexamination Control No. 90/005,742
Patent 5,253,341

1        timely updates of such information. The device could be conveniently
2        located in a home, office or hotel and could be <u>conveniently transported</u>.
3
4  '341 patent, col. 1, ll. 21-31 (emphasis added).  We note that "mobile" embraces but does not

5  require a wireless connection.

6      Kirchner discloses wireless modems for providing communication between computers,

7  terminals, and other peripheral computer equipment, such as printers and memory units.

8  Kirchner, col. 1, ll. 5-8. The examiner cites Kirchner as teaching "replacing of the telephone

9  modem with a wireless modem and the resulting advantages gained (col. 1, lines 15-40)."

10  3d Action at 107, para. 47; Final Action at 259, para. 46. These advantages include "permit[ting]

11  part or all of the computer equipment to be portable" and "facilitat[ing] physical rearrangement

12  and substitution of equipment." Kirchner, col. 1, ll. 29-30 and 35-36. Kirchner equates

13  portability with mobility by describing his wireless modem as "provid[ing] communications

14  <u>mobility</u> for <u>portable</u> usage within an office or plant environment," Kirchner, col. 2, ll. 10-14

15  (emphasis added), which is consistent with our understanding of the term "mobile" in appellant's

16  claim 103. Dr. Koopman's testimony that Kirchner does not teach "mobile use" or "mobility,"

17  2d Koopman Decl. at 197, para. 434, is unconvincing because it fails to address the foregoing

18  passage in Kirchner.

19      Dr. Koopman's testimony that appellant's '341 patent employs more than one thousand

20  times the bandwidth available on a per-station basis than does Kirchner, 2d Koopman Decl.

21  at 197, para. 435, also misses the mark in several respects. First, Kirchner is not being relied on

22  for operational details. Second, the question raised by the rejection is whether it would have

- 68 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1   been obvious to combine the teachings of Walter and Kirchner in a manner which satisfies the

2   claim, not whether it would have been obvious to combine the teachings Walter and Kirchner in

3   a manner which yields appellant's disclosed invention.

4       We agree with the examiner that in view of Kirchner's teachings about the desirability of

5   mobility and portability, it would have been obvious to make Walter's receiving stations mall

6   enough to be conveniently transported from one location to another. The rejection of claim 103

7   for obviousness over Walter in view of Kirchner is therefore affirmed.

8       **(3) Claim 103 – obvious over Walter in view of Dr. Koopman's testimony?**

9       As an alternative ground for the obviousness of making Walter's data receiving station

10  mobile, the examiner argues that "[i]t is generally recognized that mobility is a positive aspect of

11  the computer art as it allows for portability." 3d Action at 102 (unnumbered para.); Final Action

12  at 254, para. 39. As support for this assertion, the examiner cites the following testimony given

13  by Dr. Koopman in response to the previous (later withdrawn) § 112, first paragraph, rejection of

14  claim 103 for lacking written description support:

15      40. As an additional piece of support for the system [disclosed in
16  the '341 patent] being mobile (in response to examiner ¶ 16)[,] Rozmanith
17  Col. 1 line 32 states that the EUS "could be conveniently transported." In
18  1991 this would have been readily implemented using a transportable,
19  "mobile", computer such as a laptop computer just as would be possible
20  today. Mobile laptop computers had been commonly in use since at least
21  the introduction of the Grid Compass in 1983, so this was widely known
22  technology.

23

24  1st Koopman Decl. at 24, para. 40. Dr. Koopman denies that this testimony constitutes an

25  admission that it would have been obvious to substitute a mobile unit "for any arbitrary

- 69 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    computer." 2d Koopman Decl. at 192-94, paras. 422 and 424. This mischaracterizes the

2    examiner's position, which relies on the testimony as an admission that it was common practice

3    to implement some computers as portable "laptop" units. Furthermore, even without the benefit

4    of this testimony we would hold that it would have been obvious to implement Walter's data

5    receiving station as a portable "laptop" unit for the convenience of the user. See also DyStar,

6    464 F.3d at 1368, 80 USPQ2d at 1651 ("an implicit motivation to combine exists . . . when the

7    'improvement' is technology-independent and the combination of references results in a product

8    or process that is more desirable, for example because it is stronger, cheaper, cleaner, faster,

9    lighter, smaller, more durable, or more efficient.").

10        We are accordingly affirming the rejection of claim 103 for obviousness over Walter in

11    view of Dr. Koopman's testimony.

12    **R. The rejections based on Pocock**

14        **(1) Claims 93, 96, 100-02, and 104 – anticipated by Pocock?**

16        Pocock discloses systems for selectively distributing video presentations to viewers, more

17    particularly systems for enabling viewers to interactively select still frame video images and

18    accompanying audio to be distributed to them over a television system such as a cable network.

19    Pocock, col. 1, ll. 7-12. The video presentation can represent, for example, the houses being

20    offered for sale by a real estate service, in which case video frames showing the available houses

21    are individually retrieved from a suitable video storage medium. Id. at col. 1, ll. 18-24. The

22    video information is stored in presentation system 10 (Fig. 1) at a central location in a

23    compressed format, id. at col. 4, ll. 39-40, and upon read-out is decompressed by the DVS

- 70 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1   (Digital Video System) 40 in Figure 2 to produce a video signal. Id. at col. 5, ll. 36-39. The user

2   uses the remote control 16 to enter instructions into the user terminal 14, col. 3, ll. 38-41, which

3   sends instructions to the presentation system over an existing wire or fiber optic telephone

4   network 12. Id. at col. 3, ll. 26-32. The presentation system responds by encoding the video

5   frames of the requested presentation with the address of the user and sending the presentation to

6   the user over one or more channels of a CATV network. Id. at col. 3, ll. 45-59. The user

7   terminal searches the frames transmitted over that channel or channels for those which are

8   encoded with its particular address, and stores each such frame, one at a time, in a frame store,

9   with the stored frame being continually retransmitted from the terminal 14 to the viewer's

10  television receiver 36 for display as a still frame. Id. at col. 4, ll. 17-23.

11      Steps (a) to (d) of claim 93 clearly read on the foregoing disclosures in Pocock. The

12  examiner reads step (e), which requires that the displaying step commence before said step of

13  receiving said compressed or non-compressed response has been completed, on the following

14  sentence in Pocock (col. 4, ll. 23-25): "When the next frame in a desired presentation reaches the

15  user terminal, it replaces the preceding frame in the frame store and is then displayed."

16  3d Action at 96, para. 35. Dr. Koopman argues that the claim language is not satisfied, because

17  each video frame, upon which he reads the claimed "response," is written into the frame store in

18  its entirety before read-out begins. 2d Koopman Decl. at 186, para. 403. The examiner, correctly

19  in our view, explains that the claimed "response" can be read on Pocock's "presentation," which

20  consists of a plurality of video frames, and that display of the presentation begins before the last

21

Reexamination Control No. 90/005,742
Patent 5,253,341

1    frame of the presentation has been stored at the user terminal.  Answer at 206, para. 403.  We are

2    therefore <u>affirming</u> the rejection of claim 93 for anticipation by Pocock.

3            Dependent claim 96 specifies that the response comprises an animation sequence.  The

4    examiner reads this limitation on "116, 8, abstract, col. 12, lines 5-12."  3d Action at 96, para. 35;

5    Final Action at 251, para. 35.  The numeral "116" apparently refers to modulator 116 in

6    Figure 5, which depicts the components of the user terminal.  This numeral is not mentioned in

7    the specification but is shown in Figure 5 as designating a line connecting controller 104 to

8    telephone interface 122.  Dr. Koopman correctly notes that these numerals and the cited passages

9    do not indicate that the requested presentation can comprise an animated sequence.  2d Koopman

10   Decl. at 187, para. 404.  The examiner has not explained why Dr. Koopman's criticism is

11   incorrect or asserted that another part of Pocock discloses an animated sequence.  Final Action at

12   217-18, para. 404; Answer at 206-07, para. 404.  The rejection for anticipation of claim 96 over

13   Pocock is therefore <u>reversed</u>.

14           Claim 100 repeats the preamble and paragraphs (a) to (d) of claim 93 and recites as

15   paragraph (e): "wherein said compressed or non-compressed response comprises an image,"

16   which clearly reads on Pocock's disclosure of transmitting video frames.  The rejection of claim

17   100 for anticipation by Pocock is therefore <u>affirmed</u>.

18           Claim 101 repeats the preamble and paragraphs (a) to (d) of claim 93 and recites as

19   step (e):

20           (e)  wherein said compressed or non-compressed response is
21           compressed prior to receipt at said remote query and data retrieval means,
22           and wherein said compressed response is decompressed at said remote

- 72 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1       query and data retrieval means using an asymmetric technique

2       corresponding to an inverse operation of the technique used to compress

3       said compressed or non-compressed response.

4

5  Regarding the first of these "wherein" clauses, the examiner properly relies on Pocock's

6  disclosure that video information can be transmitted to the user terminal in a compressed format

7  in order to increase the transmission capacity of the system (col. 19, ll. 50-54). 3d Action at 97;

8  Final Action at 252. In Pocock thus implemented, the video signals are transmitted in digital

9  rather than analog form. Pocock, col. 19, ll. 35-38. Dr. Koopman's testimony that Pocock is

10  "silent on the manner in which compression occurs and when it occurs," 2d Koopman Decl.

11  at 188, para. 406, is not understood. Since the type of compression is not specified in claim 101,

12  any manner of compression will suffice to satisfy the claim. As for the timing of compression, it

13  is clear that the compression described in column 19, lines 50-54 of Pocock occurs prior to

14  transmission, which is necessarily prior to receipt of the compressed response by the user

15  terminal.

16      For the reasons given above in the discussion of Walter, we are construing the term

17  "asymmetric" in claim 101 to mean that the decompression technique requires a different amount

18  (less) processing power that does the corresponding compression technique. The examiner's

19  reliance on the abstract of the '341 patent as an admission that all compression and inverse

20  decompression techniques are inherently asymmetrical, 3d Action at 97; Final Action at 252, is

21  unconvincing for the reasons given above in the discussion of Walter, as is the examiner's

22  argument that the presentation system 10 and user terminal 14 inherently provide asymmetrical

23  processing power and thus inherently employ asymmetrical compression and inverse

- 73 -

1   decompression techniques. Answer at 208, para. 407. The rejection of claim 101 for

2   anticipation by Pocock is therefore reversed.

3        Claim 102 repeats the preamble and paragraphs (a) to (d) of claim 93 and recites as

4   step (e): "wherein said displaying step occurs repeatedly in response to one or more commands

5   inputted to said remote query and data retrieval system." The examiner correctly reads this

6   limitation on column 11, line 65 to column 12, line 20 (3d Action at 98, para. 37; Final Action at

7   252), which lines explain that the commands at the user's disposal during a viewing session

8   include a command to repeat a frame. Pocock, col. 12, ll. 13-16. We also note Pocock's

9   disclosure that "[t]he stored frame is continually retransmitted from the terminal 14 to the

10  viewer's television receiver 36 for display as a still frame." Pocock, col. 4, ll. 20-23. Dr.

11  Koopman's discussion (2d Koopman Decl. at 189, para. 408) of this claim does not deny that the

12  limitation recited in step (e) reads on Pocock.

13       The rejection of claim 102 for anticipation by Pocock is affirmed.

14  Claim 104 repeats the preamble and paragraphs (a) to (d) of claim 93 and recites as paragraph

15  (e): "wherein said remote query and data retrieval means further comprises a removable bulk

16  storage device containing data that is accessed and displayed based on said compressed or non-

17  compressed response to said query." The examiner reads this limitation on column 18, lines 4-23

18  of Pocock. 3d Action at 99, para. 38; Final Action at 252-53, para. 37. Lines 6-8 of column 18

19  explain it may be desirable to attach a memory unit, such as a CD ROM, to store fixed

20  information at the user terminal. Dr. Koopman's discussion (2d Koopman Decl. at 189-90,

21  para. 411) of this rejection does not deny that paragraph (e) reads on Pocock.

Reexamination Control No. 90/005,742
Patent 5,253,341

1    The rejection of claim 104 for anticipation by Pocock is therefore <u>affirmed</u>.

2    **(2) Claims 95 and 98 -- obvious over Pocock in view of Catros?**

3    Claim 95, which depends on claim 93, adds that "said compressed or non-compressed

4    response comprises an image that has been differentially compressed prior to receipt of said

5    query." The examiner correctly characterizes Pocock column 19, line 27 to column 15, line 15

6    and column 4, lines 39-40 as disclosing that compression occurs prior to receipt of a request. 3d

7    Action at 103, para. 43; Final Action at 257, para. 42. Pocock, in describing presentation system

8    10 (i.e., the central location), explains that "[p]referably, the digitized video information is stored

9    in a compressed form." Pocock, col. 4, ll. 39-40. When considered in light of the fact that "[t]he

10   presentation system 10 processes the incoming requests from the viewers and retrieves video

11   frames and accompanying audio associated with the presentations desired by the various

12   viewers," <u>id.</u> at col. 3, ll. 42-45, it is clear that compression of the stored video information

13   occurs prior to receipt of a request for the video information. The retrieved compressed video

14   frames can be transmitted in their compressed format to the user terminal, which will effect

15   decompression and display of the presentation. <u>Id.</u> at col. 19, ll. 43-61. Dr. Koopman is

16   therefore incorrect to deny that Pocock discloses compressing a response prior to receipt of a

17   query. 2d Koopman Decl. at 195-96, paras. 428-29.

18   Concerning the recited differential compression, the examiner notes that Pocock fails to

19   specify the type of compression performed and argues that "[Catros] expressly suggest[s] the

20   benefits of differential compression such as simplicity of application (col. 1) and the

21   improvement made [by Catros] as discussed in Col. 5, lines 2-22." 3d Action at 103, para. 43;

- 75 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    Final Action at 257, para. 42. Catros discloses bit-rate compression of digital television signals.

2    Catros, col. 1, ll. 9-11. Figure 1 shows a prior-art differential coding system that employs spatial

3    encoding, i.e., coding that takes into account only states of points which are geographically

4    adjacent to each point to be coded and belong to the same television frame as the point to be

5    coded. Id. at col. 3, ll. 41-44; col. 1, ll. 39-45; col. 4, ll. 6-54. Catros's improved encoding

6    system, depicted in Figures 2-9, on which the examiner specifically relies, employs the coding

7    method of Figure 1 and additional coding structures composed of predictors and quantizers

8    having different characteristics, each structure being employed as a function of the local

9    environment of each image point to be coded, specifically whether the point being encoded is in

10   an image contour areas or highly textured image area or in a uniform or slightly textured area. Id.

11   at col. 4, ll. 55-67. The passage on which the examiner specifically relies explains that one of the

12   coding structures is "[a]n inter-frame temporal or time predictor which takes into consideration

13   the state of a number of points located in different frames." Id. at col. 5, ll. 2-4.

14         Dr. Koopman contends it would have been unobvious to use Catros's inter-frame

15   differential encoding in Pocock because such encoding is designed for use with successive

16   television frames containing similar images, whereas Pocock transmits still-frame video images.

17   2d Koopman Decl. at 196, para. 430. The examiner's response (Final Action at 227-28, para.

18   430; Answer at 216, para. 430) to paragraph 430 of Dr. Koopman's testimony fails to address the

19   merits of this argument, which argument strikes us as having merit in the still-frame vis-à-vis

1    merits of this argument, which argument strikes us as having merit. We are accordingly

2    reversing the rejection of claim 95 for obviousness over Pocock in view of Catros.[52]

3           Claim 98, which depends on claim 96 ("wherein said compressed or non-compressed

4    response comprises an animation sequence"), specifies that "said animation sequence has been

5    differentially compressed prior to receipt of said query." The rejection of claim 96 for

6    anticipation by Pocock has been reversed and the examiner does not contend that it would have

7    been obvious in view of Catros to replace Pocock's still-frame video images with an animated

8    sequence. The rejection of claim 98 for obviousness over Pocock in view of Catros is therefore

9    reversed.

10        **(3) Claims 95 and 98 -- obvious over Pocock in view of Sugiyama?**

11           We agree with Dr. Koopman (2d Koopman Decl. at 197, para. 432) that the examiner's

12    alternative reliance (3d Action at 104-05, para. 45; Final Action at 258, para. 44) on Sugiyama's

13    disclosure of inter-frame differential compression (col. 2, ll. 48-62) of video signals is misplaced

14    for the same reasons as his reliance on Catros's inter-frame differential compression. More

15    particularly, Sugiyama explains that "in the first aspect of the present invention, transform

16    coefficients representative of video signals are coded and transmitted block by block only where

17    there exists a significant difference in transform coefficient between the current frame and the

18    preceding frame." Sugiyama, col. 2, ll. 40-44. A further aspect of the invention that is

19    specifically relied on by the examiner is that "in place of coding and transmitting transform

---

[52] The examiner has not argued, and we have therefore not considered, the obviousness of using the spatial (i.e., intra-frame) encoding technique described as prior art in Catros to

Reexamination Control No. 90/005,742
Patent 5,253,341

1   coefficients, it is also preferable to calculate a difference in transform coefficient between a

2   current frame and a past frame in order to code and transmit only calculated transform coefficient

3   differences in response to the difference presence signal." Id. at col. 2, ll. 49-54. Thus, whereas

4   Sugiyama's differential encoding system is designed to be used to encode a series of successive

5   television frames containing similar images, Pocock transmits still video pictures.

6       The rejection of claim 95 over Pocock in view of Sugiyama is therefore is reversed, as is

7   the rejection of claim 98 over those references.

8       **(4) Claim 99 – obvious over Pocock in view of McCalley?**

9       Claim 99, which depends on claim 93, adds that the "said compressed or non-compressed

10  response comprises audio data in digital format and wherein said displaying step comprise

11  audible playback of said audio data." Neither claim requires compression of the audio data.

12      Pocock, in discussing the analog embodiment of this invention, describes two types of

13  audio information. The first is background audio, which is combined with the video information

14  in modulators 72 (Fig. 2) for transmission in analog form to subscribers over, for example, the

15  coaxial cables of a CATV system. Pocock, col. 6, ll. 29-39. The second type of audio

16  information (hereinafter "presentation audio") consists of audio messages transmitted in analog

17  form to the user over the telephone lines. Id. at col. 4, ll. 62-65. The user terminal (Fig. 5)

18  includes (a) a video demodulator 106 for separating the video and background audio, (b) a

19  telephone interface circuit 122 for receiving the presentation audio, (c) an audio processing

---

compress Pocock's still-frame video images.

Reexamination Control No. 90/005,742
Patent 5,253,341

1   circuit 110 which combines the two types of audio for application to the speakers of a television

2   receiver via a modulator 116 and switch 100, and (d) a mute circuit 108 for controlling the level

3   of the background audio relative to the presentation audio. Id. at col. 8, ll. 11-22 and 41-55.

4   Although Pocock explains that the video signal alternatively can be transmitted in digital form

5   (col.19, ll. 27-61), he does not mention transmitting either type of audio information in digital

6   form.

7           McCalley discloses a digital, interactive communication system for transmitting, at a

8   subscriber's request, still-frame television video with an accompanying audio message.

9   McCalley, col. 1, ll. 5-8. The video/audio presentations are transmitted in the form of digital

10  packets of information to a plurality of presentation players strategically located in the vicinity of

11  the subscriber, with each packet being uniquely addressed to the requesting subscriber. Id. at

12  col. 2, ll. 42-47. The examiner states the rejection as follows:

13              Pocock et al. did not expressly disclose the playback of digital
14          audio. McCalley et al. aught the use of digital audio. It would have been
15          obvious . . . to modify the teaching of Pocock et al. with that of McCalley
16          to gain the benefit of more accurate reproduction of the original signal as
17          expressly taught by McCalley (col. 2, lines 29-32).
18
19  3d Action at 107, para. 49; Final Action at 260, para. 48. The lines cited by the examiner appear

20  in McCalley's "Summary of the Invention" and read as follows: "It is another object of the

21  presentation player of the present invention to process both video and audio signals in a digital

22  format and thereby provide a more accurate reproduction of the original signals." While the

23  examiner does not explain which of Pocock's two types of audio information he is proposing to

24  transmit in digital from, we hold that it would have been obvious in view of McCalley that when

- 79 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    Pocock's video information is being transmitted in digital form, it would have been obvious to

2    transmit the background audio and presentation audio in digital form in order to realize

3    McCalley's above-quoted goal of providing more accurate reproduction of the original audio and

4    video signals. Dr. Koopman's argument that the passage in McCalley cited by the examiner is

5    non-enabling, 2d Koopman Decl. at 199, para. 439, fails to appreciate that the rejection is based

6    on the entire McCalley disclosure and also fails to explain why undue experimentation would

7    have been required to digitize the audio signals.

8         The rejection of claim 99 for obviousness over Pocock in view of McCalley is therefore

9    affirmed.

10   **(5) Claim 103 — obvious over Pocock in view of Kirchner?**

11        Claim 103 repeats the preamble and paragraphs (a) to (d) of claim 93 and recites as

12   paragraph (e): "wherein said remote query and data retrieval means is mobile." As noted above,

13   we are interpreting the claim as requiring that the "remote query and data retrieval means" (with

14   or without the other components of the disclosed end user station) be small enough to be

15   conveniently transported.

16        Pocock explains that the transmission facility for transmitting video and background

17   music to the viewers "can be a coaxial or fiber optic cable, a broadcast transmitter, or a

18   microwave channel for distribution to individual receivers, a CATV hub or a satellite for DBS

19   broadcasts." Pocock, col. 6, ll. 36-39. Pocock does not describe the user terminals used for

20   receiving video and background music over any of these media as transportable, let alone

21   conveniently transportable. However, in view of Kirchner's above-noted teachings regarding the

- 80 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    desirability of mobility and portability, we are persuaded it would have been obvious to make

2    Pocock's user terminals small enough to permit easy transportation by a user from one location to

3    another, regardless of whether the user terminals are designed for releasable direct connection to

4    coaxial or fiber optic cables or are designed for receiving wireless broadcast signals from a

5    transmitter or satellite.

6        The rejection of claim 103 for obviousness over Pocock in view of Kirchner is therefore

7    affirmed.

8        **(6) Claim 103 – obvious over Pocock in view of Dr. Koopman's testimony?**

9        The rejection of claim 103 for obviousness over Pocock in view of Dr. Koopman's

10   testimony is affirmed for the same reason as the rejection of that claim over Walter in view of

11   that testimony.

12   **S. The rejections based on Baji**

13       **(1) Claims 93, 96, 100, 102, and 104 – anticipated by Baji?**

14       The examiner contends that claims 93, 96, 100-02, and 104 read on Baji. 3d Action at

15   99, para. 39; Final Action at 253, para. 38. Baji discloses a bidirectional image communication

16   system employing broadband ISDN or cable for transmitting programs and advertisements. Baji,

17   col. 1, ll. 6-11. Referring to Figure 1-1, the system includes a broadcast station head end 115

18   which is connected via broadband transmission lines 19 to a plurality of subscriber stations 116.

19   Each subscriber station includes a network terminal 111, a decoder 112, a terminal control unit

20   113, a program buffer 161, a commercial buffer 160, and a television monitor 114. The head end

21   115 includes a title data base 129, which includes a pointer to the corresponding file in a preview

- 81 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    data base 127, which in turn includes a pointer to the corresponding file in motion picture data

2    base 102. Figure 14A shows this hierarchical relationship in pictorial form. Head end 115 also

3    includes an image encoder 107 for achieving bandwidth compression of a motion picture

4    program signal 1 (from motion picture data base 102), a broadcast signal 6, and a still picture

5    signal 13. Id. at col. 1, ll. 40-44. Figure 15 shows an example of a subscriber system 116 useful

6    for hierarchical data retrieval.

7         Figures 14B-14E show how the subscriber system depicted in Figure 15 is used to select a

8    motion picture. Figure 14B shows a list of motion picture titles, obtained from title data base

9    129, being displayed on the television monitor 114 of the subscriber station. Id. at col. 11, ll. 49-

10    52 and 66. The subscriber uses a mouse or the remote control tablet 136 of remote controller 135

11    (Fig. 15) to select one of these titles, thereby initiating a display of the corresponding preview

12    (Fig. 14C), which is obtained from preview data base 127 and can be stored in short version

13    cache memory 166 in the subscriber apparatus. Id. at col. 11, l. 66-68; col. 12, ll. 38-50. If the

14    program is selected for viewing by the user, the system uses the pointer in the preview program

15    to obtain access to and thus downloading of the corresponding motion picture program in motion

16    picture data base 102 (Fig. 1-1). Id. at col. 12, ll. 9-14. The downloaded, compressed motion

17    picture information is decompressed in the subscriber apparatus by decoder 112 for display on

18    television monitor 114. Id. at col. 1, ll. 65-67.

19         The preamble of claim 93 ("A method of downloading responsive data from a remote

20    server comprising . . .") clearly reads on Baji's system. Step (a) ("identifying a query via a data

21    input means and inputting said query to remote query and data retrieval means") reads on using

- 82 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    the remote controller and other subscriber apparatus to select a motion picture for viewing.

2    Step (b) ("transmitting said query from said remote query and data retrieval means to a remote

3    server via an input/output means") reads on network terminal 111. Step (c) ("receiving a

4    compressed or non-compressed response to said query at said remote query and data retrieval

5    means from said remote server via said input/output means") reads on receiving compressed

6    motion picture data from head end 115 and storing the motion picture data in program

7    buffer 161. Dr. Koopman's testimony that Baji fails to disclose "receiving a compressed or non-

8    compressed response," 2d Koopman Decl. at 190, para. 415, appears to be based on the

9    misconception that Baji must disclose receiving compressed and non-compressed responses;

10   reception of either type of response is enough, as noted by the examiner. Final Action at 221,

11   para. 415; Answer at 210, para. 415.

12       Step (d) ("displaying a presentation corresponding to said compressed or non-compressed

13   response on output means") reads on using the television monitor 114 to display the selected,

14   decompressed motion picture data that is read out of the program buffer. Dr. Koopman's

15   testimony (2d Koopman Decl. at 190-91, para. 416) that the television monitor 114 and program

16   buffer do not teach displaying a presentation corresponding to the response is not understood.

17       The examiner reads step (e), which specifies that "said displaying step commences before

18   said step of receiving said compressed or non-compressed response has been completed," on the

19   following passage sentence:

20            While an access is effected on a motion picture data base, it is
21       possible to use a playback control function 170 for various operations such
22       as a fast forward operation, a rewind operation, a temporary stop, and a

- 83 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1     slow display, thereby achieving a remote control on the motion picture
2     data base located in the head end 115. The function above is also
3     available during an operation of a local video image recording apparatus
4     133.
5
6 Baji, col. 12, ll. 15-22. We agree that the fast forward, temporary stop, and slow display

7 operations necessarily imply that the display of a selected motion picture begins prior to

8 completion of downloading of that motion picture. Dr. Koopman's testimony that the cited

9 sentence "is silent on the matter as to when the display begins relative to receiving," 2d Koopman

10 Decl. at 191, para. 417, fails to address the necessary implications of the quoted sentence.

11     The rejection of claim 93 for anticipation by Baji is therefore <u>affirmed</u>, as is the

12 anticipation rejection of dependent claim 96, which specifies that the response is an animated

13 sequence.

14     The anticipation rejection is likewise <u>affirmed</u> with respect to independent claim 100,

15 which repeats the preamble and steps (a) to (d) of claim 93 and recites as step (e): "wherein said

16 compressed or non-compressed response is an image."

17     Claim 102 repeats the preamble and steps (a) to (d) of claim 93 and in step (e) specifies

18 that "said displaying step occurs repeatedly in response to one or more commands inputted to

19 said remote query and data retrieval means." The examiner (3d Action at 100, para. 39) reads

20 this step on the same passage, reproduced above, on which he reads step (e) of claim 93, which

21 passage describes playback operations such as a fast forward operation, a rewind operation, a

22 temporary stop, and a slow display. Baji, col. 12, ll. 15-22. During the temporary stop and slow

23 display playback operations, frames of motion picture data inherently will be repeatedly read out

- 84 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    of the program buffer and displayed. Dr. Koopman (2d Koopman Decl. at 192, para. 420) fails to

2    explain why this is not the case. The rejection of claim 102 for anticipation by Baji is <u>affirmed</u>.

3       Claim 104 repeats the preamble and steps (a) to (d) of claim 93 and in step (e) specifies

4    that the remote query and data retrieval means further comprises "a removable bulk storage

5    device containing data that is accessed and displayed based on said compressed or non-

6    compressed response to said query." The examiner reads this limitation on column 18, lines 4-

7    23. 3d Action at 100, para. 39; Final Action at 154, para. 38. In response to Dr. Koopman's

8    criticism that the cited lines make no mention of storage, removable or otherwise, 2d Koopman

9    Decl. at 192, para. 421, the examiner shifted his reliance to column 16, lines 15-22, Final Action

10    at 223, para. 421, which explain that the program and commercial recorders can be implemented

11    as video tape recorders. We agree with the examiner that the buffers thus implemented satisfy

12    the claim language and are accordingly <u>affirming</u> the rejection of claim 104 for anticipation by

13    Baji.

14    **(2) Claims 94 and 97 – obvious over Baji in view of Catros?**

15       Dependent claim 94 calls for differential compression of an image <u>following</u> receipt of

16    the query, as does claim 97, which additionally specifies through its dependence on claim 96 that

17    the response represents an animated sequence.[53] As is apparent from Figure 1-1 of Baji, the

18    motion picture data are subjected to bandwidth compression by image encoder 107 (col. 1, ll. 40-

19    44; col. 4, ll. 19-34) after being read out of data base 102 in response to a query. However, Baji

---

[53] Dr. Koopman's assertion that claim 97 recites "differentially compressed ***prior to*** receipt of said query" is incorrect. 2d Koopman Decl. at 195, para. 426.

Reexamination Control No. 90/005,742
Patent 5,253,341

1    does not describe the type of compression performed by encoder 107. Catros, as already noted,

2    discloses differential compression of television video signals. We agree with the examiner that it

3    would have been obvious to implement Baji's image encoder 107 so as to perform Catros's

4    differential encoding on the motion picture signals. 3d Action at 103, para. 42; Final Action at

5    256, para. 41. Dr. Koopman's argument that "Catros does not specifically provide motivation to

6    combine differential compression with other elements of a Rozmanith-style system,"

7    2d Koopman Decl. at 194-95, para. 425, appears to be directed to appellant's disclosure rather

8    than the claimed subject matter.

9        The rejection of claims 94 and 97 for obviousness over Baji in view of Catros is therefore

10   affirmed as to both claims.

11       **(3) Claims 94 and 97 – obvious over Baji in view of Sugiyama?**

12       We agree with the examiner that it would have been obvious to have the compression

13   performed on Baji's motion picture signals by Baji's image encoder 107 take the form of the

14   differential encoding technique disclosed by Sugiyama. 3d Action at 104, para. 44; Final Action

15   at 257, para. 43. Dr. Koopman's testimony regarding this rejection does not address the merits of

16   combining Sugiyama's differential encoding with Baji, instead arguing that those references fail

17   to satisfy the limitations of parent claim 93. 2d Koopman Decl. at 196, para. 431 (citing id. at

18   194-95, paras. 425-26). As that argument is unconvincing, the rejection of claims 94 and 97 for

19   obviousness over Baji in view of Sugiyama is affirmed as to both claims.

20

21

- 86 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1  **(4) Claim 99 – obvious over Baji in view of McCalley?**

2  Claim 99, which depends on claim 93, adds that "said compressed or non-compressed

3  response comprises audio data in digital format and wherein said displaying step comprise

4  audible playback of said audio data." We are of the opinion that a person skilled in the art

5  would have understood that Baji's compressed, digital motion picture signals would inherently

6  contain digital audio that is audibly reproduced by television monitor 114, which is similar to the

7  position taken by the examiner in arguing that claim 99 is anticipated by Walter. Final Action at

8  214, para. 395; Answer at 204, para. 395. Inasmuch as anticipation is epitome of obviousness, In

9  re McDaniel, 293 F.3d 1379, 1385, 63 USPQ2d 1462, 1466-67 (Fed. Cir. 2002), we are

10 affirming the rejection of claim 99 for obviousness over Baji in view of McCalley.

11 Alternatively, we are affirming on the ground that transmitting Baji's audio information

12 in digital form would have been obvious from column 2, lines 29-32 of McCalley, as asserted by

13 the examiner. 3d Action at 108, para. 50; Final Action at 260-61, para. 49. Dr. Koopman's

14 argument that the cited passage in McCalley in non-enabling (2d Koopman Decl. at 199, para.

15 441) is unconvincing for the reasons given above in the discussion of the rejection of claim 99

16 over Pocock in view of McCalley.

17 **(5) Claim 103 – obvious over Baji in view of Kirchner?**

18 The rejection of claim 103 ("mobile") for obviousness over Baji in view of Kirchner is

19 affirmed for reasons like the those given above in affirming the rejection of this claim over

20 Walter in view of Kirchner.

21

- 87 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    **(6) Claim 103 – obvious over Baji in view of Dr. Koopman's testimony?**

2    The rejection of claim 103 ("mobile") for obviousness over Baji in view of Dr.

3    Koopman's testimony is <u>affirmed</u> for the reasons given above in the discussion of the rejection of

4    this claim over Walter in view of that testimony.

5    **T. The rejections based on Cohen**

6    **(1) Claims 93, 94, 96, and 97 – obvious over Cohen in view of Sugiyama?**

7    Cohen, after explaining that "real time viewing via cable and broadcast networks, as well

8    as viewing of cassette recording have serious drawbacks," col. 1, ll. 16-18, discloses a video

9    communications system that makes it possible for home viewers to download a movie in digital

10   format from a large archive library, store the digital movie file locally, and view the movie at any

11   convenient time. <u>Id.</u> at col. 1, ll. 39-42. Figure 4 shows the central source of video and audio

12   data; Figures 1-3 show a user terminal. Referring to Figure 2, the keypad 102 (corresponding to

13   the recited "data input means" and "input/output means") is used to identify the movie to be

14   downloaded. The central processing unit 104 (the recited "remote query and data retrieval

15   means") is responsive to this information and uses modem 110 to digitally transmit the

16   identifying information (the claimed "query") over telephone line 112. <u>Id.</u> at col. 4, ll. 50-63.

17   The requested digital data file (the claimed "compressed or non-compressed response")

18   representing the requested movie is received over phone line 112 and modem 110 from the

19   central location and stored in disk storage system 114. <u>Id.</u> at col. 4, ll. 64-67. When the file is

20   fully downloaded, the display 118 so indicates and the telephone link is broken, <u>id.</u> at col. 5, ll. 2-

21   4, after which the user can cause the movie to be played back and converted to a composite video

- 88 -

Reexamination Control No. 90/005,742
Patent 5,253,341

1    signal on line 124 for display on a display device (not shown). Id. at col. 5, ll. 5-17. Thus,

2    Cohen fails to disclose having the user terminal begin to display the movie before downloading is

3    complete, as required to satisfy step (e) ("said displaying step commences before said step of

4    receiving said compressed or non-compressed response has been completed"). As evidence of

5    obviousness of modifying Cohen so as to operate in the claimed manner, the examiner cites

6    Sugiyama and also refers to Punj, which is not mentioned in the statement of the rejection:

7            Sugiyama et al. disclosed a system for compressing upon transmission to
8            allow for realtime display of the transmitted video. It would have been
9            obvious . . . to combine the teachings of Cohen and Sugiyama et al.[, a]s
10           the more efficient coding would reduce the cost of as taught by Sugiyama
11           et al. in col. 2, lines 6-22[.] [F]urther motivation for the combination is
12           suggested by Punj page 112, col. 1, with the desirability of video on
13           demand.
14
15   3d Action at 92, para. 26; Final Action at 247, para. 26. While is it fair to characterize Sugiyama

16   as disclosing compression of video upon transmission and real-time display of the transmitted

17   video (e.g., visual telephone data), we are not persuaded that it would have been obvious to

18   modify Cohen in view of Sugiyama so as to provide real-time display of downloaded video

19   information. The reason is that Cohen has no interest in obtaining real-time display of

20   downloaded video information. To the contrary, the stated purpose of his invention is to avoid

21   the drawbacks associated with real-time display of such information by downloading it in

22   nonreal-time format for storage and later viewing at a convenient time. Cohen, col. 1, ll. 39-42.

23   Furthermore, there is no indication in Sugiyama that its encoding technique is capable of

24   providing real-time display of movies, the type of video information being downloaded in Cohen.

25

- 89 -